STANLEY W. HAAG, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2902-84.          Filed March 16, 1987.

*Ronald L. Mountsier*, for the petitioner.
*Vincent E. Mauer*, for the respondent.

WILLIAMS, *Judge:* \* The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1979 | $94,060.30 |
| 1980 | 72,057.91 |
| 1981 | 84,240.17 |

The issues we must decide are (1) whether certain income reported by petitioner's closely held corporation during the years in issue is taxable to petitioner pursuant to section 61[1] and the assignment of income doctrine; and (2) whether such income is allocable to petitioner pursuant to section 482.

### FINDINGS OF FACT

All of the facts have been stipulated and, except as noted (see notes 2 and 3 *infra*), are so found. Petitioner Stanley W. Haag, resided at Adel, Iowa, when he filed his petition in this case. Petitioner timely filed Federal income tax returns for the taxable years 1979, 1980, and 1981.

Petitioner is a physician licensed to practice medicine in the State of Iowa. Prior to March 16, 1976, petitioner was a general partner in the Hilltop Medical Clinic (Hilltop), a partnership organized on January 1, 1967, under the laws of the State of Iowa. Petitioner joined the partnership no later than June 1971. Although the partnership agreement provides for amendment, it has not been amended to reflect the retirement or resignation of the original partners or the

---

\*By order of the Chief Judge, this case was reassigned to Judge Williams for decision and opinion.

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

addition of new partners. Petitioner's name, therefore, does not appear on any written partnership agreement.

On March 16, 1976, petitioner organized Stanley W. Haag, M.D., P.C. (the P.C.), under the Iowa Professional Corporation Act, Iowa Code, ch. 496C (1986). The P.C. subsequently adopted bylaws, opened bank accounts in its name, caused a board of directors to be elected, elected officers, and held shareholder and director meetings. Petitioner was the sole director of the P.C. Petitioner and John L. Henss[2] were the officers of the P.C., and petitioner and an employee stock ownership plan were the sole shareholders. The P.C. at all times has been a validly organized and operated professional corporation under Iowa law. The P.C. is not a sham or dummy corporation and is an entity taxable apart from its owners and employees. A business purpose for the formation of the P.C. was to continue the medical practice and other businesses of petitioner. The P.C. adopted an employee stock ownership plan ("ESOP") and a medical reimbursement plan.

On or about March 16, 1976, petitioner assigned his interest in Hilltop to the P.C. Hilltop employed all of the partnership's nonprofessional employees and paid office, lab, medical, and rent expenses. Hilltop also issued checks for malpractice insurance covering each partner, but charged the amounts paid to the partners' drawing accounts. The P.C. thus paid for petitioner's malpractice insurance.

Hilltop issued Schedules K-1 to the P.C. for Hilltop's 1979, 1980, 1981, and 1982 taxable years showing the P.C.'s distributive share of Hilltop income and its withdrawals and distributions as follows:

| Year | Ordinary income | Withdrawals and distributions |
|------|-----------------|-------------------------------|
| 1979 | $205,383 | $202,597 |
| 1980 | 204,716 | 196,287 |
| 1981 | 228,802 | 234,599 |
| 1982 | 260,901 | 251,551 |

[2]The parties have stipulated that petitioner was the sole officer of the P.C. The minutes of the annual meetings of the board of directors, however, show that from the time the P.C. was formed through 1982, petitioner served as president, secretary, and treasurer, and John L. Henss served as assistant secretary.

Petitioner entered into an employment agreement with the P.C. on March 16, 1976. The agreement provides, in relevant part:

1. EMPLOYMENT

(a) The Corporation hereby employs the Employee to perform professional services on behalf of the Corporation and to render such services as are necessary for the Corporation to operate and maintain an establishment for * * * the practice of medicine.

\* \* \* \* \* \* \*

(d) The Employee agrees to devote his entire time, attention, knowledge and skill to such employment and shall at all times maintain and enhance the reputation of the Corporation, its shareholders and employees and the profession, generally.

Compensation for petitioner's services was left to the discretion of the board of directors after taking into account the P.C.'s and petitioner's cash-flow needs.

In addition to the partnership interest in Hilltop, petitioner contributed farms and a dog kennel and breeding operation to the P.C. on March 16, 1976. In exchange for the partnership interest, professional equipment, land, the farms, and the kennel and breeding operations, the P.C. assumed certain indebtedness of petitioner ($123,500 owed to the West Des Moines State Bank), issued to petitioner 100 shares of stock with no par value but valued at the time of the transfer at $10 each, and a non-interest bearing note in the face amount of $56,085.66. The transaction qualified for nonrecognition treatment under section 351(a).

The P.C. acquired two farms from petitioner totaling 280 acres, portions of which were used for grain farming and portions for the kennel operations and related activities. At all relevant times, the P.C. owned 30 to 70 dogs. The P.C. trained hunting dogs, boarded dogs, and bred dogs. The P.C. was known for its German shorthaired pointers and German wirehaired pointers and some of its dogs were of "national quality." Petitioner is a recognized national expert on these breeds. The P.C. also ran a shooting club on the farm property and hunters paid a fee to hunt. The farm was stocked with game birds and the P.C. operated the farm in such a way as to increase the game bird population.

The P.C.'s income from the farm, kennel, and breeding operations for the fiscal years ending February 29, 1980,

February 28, 1981, and February 28, 1982, was as follows:

|  | 2/29/80 | 2/28/81 | 2/28/82 |
|---|---|---|---|
| Total income | $19,388.94 | $11,451.38 | $8,830.12 |
| Expenses | 105,814.21 | 84,884.71 | 96,887.32 |
| Net income | (86,425.27) | (73,433.33) | (88,057.20) |

On November 28, 1978, Doc's Renowned Restaurant, Ltd. (the Restaurant), was incorporated as a wholly owned subsidiary of the P.C. During all relevant periods, the P.C. and the restaurant filed consolidated Federal income tax returns. The P.C.'s net income from the restaurant for the fiscal years ending February 29, 1980, February 28, 1981, and February 28, 1982, was as follows:

|  | 2/29/80 | 2/28/81 | 2/28/82 |
|---|---|---|---|
| Total income | $539,663.12 | ($10,589.67) | $27,750.00 |
| Costs of goods sold | 430,550.41 | 26,585.37 | 0 |
| Expenses | 207,975.98 | 93,941.63 | 34,459.58 |
| Net income | (98,863.27) | (131,116.67) | (6,709.58) |

The P.C. entered into separate written agreements in 1978 to provide medical services to the Mitchellville Girls Training School (the Training School) and the Mitchell Village Care Center (the Care Center). The P.C. received the following income from those contracts for the fiscal years ending February 29, 1980, February 28, 1981, and February 28, 1982:

|  | 2/29/80 | 2/28/81 | 2/28/82 |
|---|---|---|---|
| Training School | $11,898.00 | $7,272.00 | $12,885.36 |
| Care Center | 9,454.74 | 13,038.72 | 5,567.45 |

Petitioner made an unknown number of cash advances to the P.C. between March 16, 1976, and February 28, 1979. As of February 28, 1979, the P.C.'s books reflected that it owed petitioner $105,243.59. During the years in issue, the P.C. repaid that amount in full and transferred to petitioner additional amounts so that on February 28, 1982, petitioner had taken out of the P.C. $27,400.02 more than the $105,243.59 of cash he had advanced.

Petitioner's "loans" to the P.C. initially did not state any interest, but beginning on March 1, 1980, 10-percent interest was accrued on the average annual balance outstanding. Petitioner reported interest income from the P.C. of $5,765.03 and $1,130.22, respectively, on his 1981 and 1982

tax returns. A promissory note was issued for petitioner's initial $56,085.66 loan to the P.C. in 1976, but no promissory notes were issued for any of petitioner's subsequent advances to the P.C. or the P.C.'s payments to petitioner. No security was given for any of the loans between petitioner and the P.C.

The P.C. paid petitioner no salary from March 1, 1979, through January 31, 1982. In February 1982, the P.C. paid petitioner an $18,000 bonus for the fiscal year ending February 28, 1982, and contributed $2,700 to the ESOP on petitioner's behalf. Petitioner also received the following amounts from the P.C. as tax-exempt medical reimbursements:

| TYE— | Amount |
|---|---|
| 2/28/79 | $724 |
| 2/29/80 | 731 |
| 2/28/81 | 0 |
| 2/28/82 | 293 |

The P.C. reported its distributive share of Hilltop income on its corporate tax returns. Petitioner reported only his salary from the P.C. on his individual tax returns. During the years in issue, petitioner reported the following income from the P.C. and the P.C. reported the following income from Hilltop:

| Petitioner's taxable years | TYE— | Petitioner's salary | Income interest | P.C.'s Hilltop income |
|---|---|---|---|---|
| 1979 | 2/29/80 | $44,793.67 | 0 | $205,383 |
| 1980 | 2/28/81 | 0 | 0 | 204,716 |
| 1981 | 2/28/82 | 0 | $5,765.03 | 228,802 |

In 1979, 1980, and 1981, petitioner withdrew $5,635, $7,906, and $8,558, respectively, from Hilltop without recording the withdrawals on the P.C.'s books. Petitioner did not report the withdrawals as income on his individual income tax returns for those years.

The nature of the medical services that petitioner provided to patients at Hilltop was not changed by the existence of the P.C. Neither petitioner nor the P.C. made any effort to notify patients treated at Hilltop before or after March 16, 1976, that the P.C. existed and had assumed petitioner's medical practice.

The following schedule summarizes the P.C.'s income and expenses as reported on its tax returns for the years in issue:

| | P.C.'s taxable year ended— | | | |
|---|---|---|---|---|
| | 2/28/79 | 2/29/80 | 2/28/81 | 2/28/82 |
| Hilltop income (per K-1) | $159,022 | $205,383 | $204,716 | $228,802 |
| Other medical income | 16,149 | 21,353 | 20,311 | 24,136 |
| Dog and farm income | 13,590 | 19,389 | 11,451 | 8,830 |
| Interest and dividends | 220 | 6,351 | 1,579 | 142 |
| Restaurant income (net of cost of sales) | 22,012 | 106,792 | (37,175) | 27,750 |
| Total income | 210,993 | 359,268 | 200,882 | 289,660 |
| | | | | |
| Petitioner's salary | 47,250 | - - - | - - - | 18,000 |
| Other salaries—medical[1] | - - - | 5,236 | - - - | - - - |
| Payroll taxes | 5,580 | 445 | - - - | - - - |
| Medical expense reimbursement | 724 | 731 | - - - | 293 |
| Deferred compensation (ESOP) | - - - | - - - | - - - | 2,700 |
| Other medical expenses | 2,632 | 6,317 | 22,013 | 11,568 |
| Dog, farm, and restaurant expenses | 148,763 | 334,683 | 219,564 | 164,627 |
| Total expenses | 204,949 | 347,412 | 241,577 | 197,188 |
| Taxable income | 6,044 | 11,856 | (40,695) | 92,472 |

[1]The record does not identify this expense. It is stipulated that the P.C. employed no medical personnel or individuals with any medical training, expertise or employment background other than petitioner.

In his notice of deficiency dated November 18, 1983, respondent allocated the P.C.'s Hilltop income to petitioner.

### OPINION

The first issue we must decide is whether petitioner or the P.C. earned the income from the Hilltop Medical Center partnership during the taxable years 1979, 1980, and 1981, and thus whether such income is taxable to petitioner pursuant to section 61 and the assignment of income doctrine. The principle that income is taxed to the one who earns it is basic to our system of income taxation. *Commissioner v. Culbertson*, 337 U.S. 733, 739-740 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930). The generally accepted test for resolving who is to be taxed requires us to

determine who actually earned the income. In the corporate context, however, the actual earner test may be inadequate because a corporation can earn income only through the personal services of its employees and agents. *Johnson v. Commissioner*, 78 T.C. 882, 890-891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), cert. denied 469 U.S. 857 (1984). This Court, therefore, has applied a more refined test which looks to who controls the earning of income. See *Vercio v. Commissioner*, 73 T.C. 1246, 1254-1255 (1980). In *Johnson v. Commissioner*, we set out the two requirements that must be met before a corporation, rather than its service-performer employee, will be considered the controller of the income and taxable thereon:

First, the service-performer employee must be just that—an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. *Second*, there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. [78 T.C. at 891. Emphasis added. Citations and fn. ref. omitted.][3]

Petitioner contends that section 61 and the assignment of income doctrine are inapplicable in this case because the parties have stipulated that the P.C. is validly organized and operated and is not a sham or dummy corporation. The assignment of income doctrine is an essential tool for preventing a taxpayer from assigning income to a corporation (or other person) to avoid tax liability. A finding that the P.C. is not a sham does not preclude application of the assignment of income doctrine because a taxpayer can assign income to a corporation with real and substantial businesses to avoid tax liability. *Wilson v. United States*, 530 F.2d 772, 778 (8th Cir. 1976).We nevertheless find that the P.C.'s Hilltop income is not allocable to petitioner pursuant to section 61 or the assignment of income doctrine because the P.C. controlled the earning of the income.

The first element of the control test is satisfied if petitioner was an employee over whom the P.C. could exercise control in a meaningful sense. The employment

---

[3]The Seventh Circuit and the Federal Circuit have rejected the two-part test in favor of a more flexible facts and circumstances approach. See *Schuster v. Commissioner*, 800 F.2d 672 (7th Cir. 1986); *Fogarty v. Commissioner*, 780 F.2d 1005 (Fed. Cir. 1986). We need not resolve any conflict between these tests because we would reach the same result applying the facts and circumstances analysis.

agreement that petitioner and the P.C. entered into on March 16, 1976, provides in relevant part:

1. EMPLOYMENT

   (a) The Corporation hereby employs the Employee to perform professional services on behalf of the Corporation and to render such services as are necessary for the Corporation to operate and maintain an establishment for * * * the practice of medicine.

   *       *       *       *       *       *       *

   (d) The Employee agrees to devote his entire time, attention, knowledge and skill to such employment and shall at all times maintain and enhance the reputation of the Corporation, its shareholders and employees and the profession, generally.

Respondent contends that this agreement did not give the P.C. any real control over petitioner's services because, as the P.C.'s sole director and one of only two shareholders (the other being the ESOP), petitioner could modify or rescind the agreement or could, and did, ignore it. We find respondent's argument to be without merit. There is nothing in the record to indicate that petitioner ignored the employment agreement. The ability of a majority or sole shareholder to ignore, rescind, or modify an agreement entered into with his corporation exists in every closely held corporation. A holding that such ability precludes a corporation from exercising control over its employee's earning of income, and thus being taxable on that income, would violate the longstanding recognition of corporations as entities independent of their shareholders. See *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438-439 (1943). We find that the employment agreement effectively gave the P.C. the right to control petitioner's medical practice.

The second element of the control test requires that there exist a contract or similar indicium recognizing the corporation's controlling position entered into between the corporation and the entity to whom it provides services. There was no written agreement between Hilltop and the P.C. Petitioner assigned his interest in Hilltop to the P.C., but Hilltop did not amend its partnership agreement to reflect the assignment. It is nonetheless evident that Hilltop recognized the P.C. as a partner because it listed the P.C., and not petitioner, as the partner on Schedules K-1, Partner's Share of Income, Credits and Deductions, for each

of the years in issue. Moreover, it should be noted that Hilltop did not amend its partnership agreement to reflect petitioner's admission to the partnership in 1971. Although there was no formal contract between Hilltop and the P.C., Hilltop recognized the P.C. as the entity who controlled the provision of medical services by petitioner, and therefore the earning of income.

Respondent cites two cases in which this Court has upheld reallocations of income under the assignment of income doctrine from a validly organized and operated corporation to its shareholder/employees. See *Jones v. Commissioner*, 64 T.C. 1066 (1975); *Roubik v. Commissioner*, 53 T.C. 365 (1969). Both cases are distinguishable. In *Jones v. Commissioner, supra*, the taxpayer, an official court reporter, formed a personal service corporation to loan out his services despite the legal requirement that a court reporter be an individual and not a corporation. In addition, the taxpayer never entered into an employment agreement with the corporation and remained under the direct control of the judge to whom he was assigned. Although we found that the corporation was not a sham, we held that the taxpayer assigned his income from court reporting to the corporation because by law the corporation could not perform such services.

In *Roubik v. Commissioner, supra*, four radiologists formed a corporation and entered into employment agreements with it. The corporation was validly organized under State law. We nonetheless held that the corporation did not have any right to control the professional activities of its "employees" and that the radiologists had assigned their income to the corporation. The corporation did not enter into any agreements with third parties to provide medical services and agreements between the physicians acting in their individual capacities and third parties persisted after the corporation was formed.

In the present case, in contrast, an effective employment agreement existed between petitioner and the P.C.; Hilltop recognized the P.C. as the entity through which petitioner provided medical services; and the medical partnership interest could be transferred to a corporation under Iowa

law. We, therefore, hold that the P.C., and not petitioner, earned the income from Hilltop in 1979, 1980, and 1981.

Our determination that the P.C. earned the income from Hilltop does not, however, end our inquiry. Next we must decide whether respondent properly allocated the Hilltop income for the taxable years 1979, 1980, and 1981, from the P.C. to petitioner pursuant to section 482. Section 482 permits respondent to reallocate income actually earned by one member of a controlled group to other members of that group if (1) there are two or more trades, businesses, or organizations, (2) the enterprises are owned or controlled by the same interest, and (3) reallocation of income among the enterprises is necessary to clearly reflect income or to prevent the evasion of taxes. *Wilson v. United States*, 530 F.2d 772, 777 (8th Cir. 1976). Respondent's section 482 allocation will be sustained unless petitioner establishes that it is arbitrary, capricious, and unreasonable. *Pacella v. Commissioner*, 78 T.C. 604, 618 (1982); *Keller v. Commissioner*, 77 T.C. 1014, 1022 (1981), affd. 723 F.2d 58 (10th Cir. 1983).

This Court has held that section 482 applies in the one-man personal service corporation context. *Keller v. Commissioner, supra*.[4] The purpose of section 482 is to place a controlled taxpayer in the same position as an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer in accordance with the standard of an uncontrolled taxpayer dealing at arm's length. Sec. 1.482-1(b)(1), Income Tax Regs.; *Hospital Corp. of America v. Commissioner*, 81 T.C. 520, 593 (1983).

---

[4]Petitioner asks us to reconsider our holding that sec. 482 applies to one-man personal service corporations in light of the Seventh Circuit's holding that sec. 482 does not apply in such cases because the dual trade, business or organization requirement is not met. See *Foglesong v. Commissioner*, 691 F.2d 848 (7th Cir. 1982), revg. 77 T.C. 1102 (1981). This Court has held and the Eighth Circuit, to which an appeal would lie in this case, has implied, that sec. 482 may be used to allocate income from a personal service corporation to a shareholder/employee. See *Wilson v. United States*, 530 F.2d 772, 777 (8th Cir. 1976); *Pacella v. Commissioner*, 78 T.C. 604, 618 (1982); *Keller v. Commissioner*, 77 T.C. 1014, 1022 (1981), affd. 723 F.2d 58 (10th Cir. 1983).

We note that petitioner was the P.C.'s sole medical employee, but the record does not indicate whether petitioner personally managed and operated the P.C.'s dog breeding, farming, and restaurant businesses. If not, the P.C. is not a personal service corporation. Because the only income reallocated by respondent is from Hilltop and was earned through petitioner's personal efforts, however, we find the case law concerning personal service corporations applicable here regardless of whether petitioner personally managed the P.C.'s nonmedical businesses.

The requirement that there be two or more trades, businesses, or organizations for a section 482 allocation is to be construed broadly. *Wilson v. United States*, 530 F.2d at 777; *Keller v. Commissioner*, 77 T.C. at 1022. Petitioner and the P.C. satisfy the dual business requirement. Petitioner is in the business of providing medical services as an employee of the P.C., and the P.C., as a partner in Hilltop, is in the business of providing medical services through petitioner. See *Keller v. Commissioner*, 77 T.C. at 1024.[5] Petitioner's business and the P.C.'s business are also under common control. At issue, is whether a reallocation of income is necessary to clearly reflect income or to prevent the evasion of taxes. To determine whether a reallocation is necessary to clearly reflect income or to prevent the evasion of taxes, we must decide whether the agreement between the taxpayer and the corporation reflected arm's-length dealing.

We note that, in general, petitioner did not engage in transactions with the P.C. at arm's length. Numerous "loan" transactions between petitioner and the P.C. evidence a lack of arm's-length dealing. On March 16, 1976, when the P.C. was formed, petitioner loaned the P.C. $56,085.66 without interest. Between March 16, 1976, and February 28, 1979, petitioner made an unknown number of additional cash advances to the P.C. totaling $49,157.93. Between February 28, 1979, and February 28, 1982, the P.C. repaid these cash advances to petitioner and made an unknown number of additional cash advances to petitioner totaling $27,400.02.

Whether a withdrawal of funds by a shareholder from a corporation or an advance made by a shareholder to a corporation creates a true debtor-creditor relationship is a factual question to be decided based on all relevant facts and circumstances. *J.S. Biritz Construction Co. v. Commissioner*, 387 F.2d 451, 453 (8th Cir. 1967), revg. a Memorandum Opinion of this Court; *Haber v. Commissioner*, 52 T.C. 255 (1969), affd. 422 F.2d 198 (5th Cir. 1970). For disburse-

---

[5]Respondent argues for the first time on brief that petitioner's assignment of his partnership interest in Hilltop was invalid and that the P.C. never replaced petitioner as a partner in Hilltop. Issues raised for the first time on brief are waived. *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975). Moreover, respondent admitted in his answer that the P.C. was a partner in Hilltop during the years in issue. Respondent is bound by that admission.

ments to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment. *Haber v. Commissioner, supra* at 266; *Saigh v. Commissioner,* 36 T.C. 395, 419 (1961). Because direct evidence of a taxpayer's state of mind is not generally available, courts have focused on certain objective factors to distinguish bona fide loans from disguised dividends, compensation, and contributions to capital.[6]

As part of the consideration for petitioner's transfer of assets to the P.C. in 1976, the P.C. gave petitioner a promissory note for $56,085.66. The note was unsecured and did not provide for the payment of interest, but it expressly provided for repayment on March 31, 1986, and the note was actually repaid by February 29, 1982. We believe that at the time they entered into the transaction, both parties intended the promissory note to represent a bona fide indebtedness of the P.C. to petitioner.

As to the other advances that petitioner made to the P.C., however, we find no intent to create a true debtor-creditor relationship. Instead, we find that petitioner, in effect, treated the P.C. as his personal bank, depositing and withdrawing funds at will. Petitioner advanced $49,157.93 to the P.C. between March 16, 1976, and February 28, 1979. There are no debt instruments evidencing the advances and no provisions for security, interest payments,[7] or a fixed time for repayment. The advances are listed as credits on the P.C.'s books under the headings "Deposits from S.W. Haag" and "Cash from S.W. Haag" but there is no indication of when or whether these amounts were to be repaid. There is no evidence that petitioner was uncondition-

---

[6]Among the factors relevant to this case are: (1) The existence or nonexistence of a debt instrument; (2) provisions for security, interest payments and a fixed repayment date; (3) treatment of the funds on the corporation's books; (4) whether repayments were made; (5) the extent of the shareholder's participation in management; and (6) the effect of the "loan" on the shareholder/employee's salary. See *In re Uneco, Inc.,* 532 F.2d 1204, 1208 (8th Cir. 1976); *In re Indian Lakes Estates, Inc.,* 448 F.2d 574, 578-579 (5th Cir. 1971); *Haber v. Commissioner,* 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). See also *Baird v. Commissioner,* T.C. Memo. 1982-220; *Astleford v. Commissioner,* T.C. Memo. 1974-184, affd. per curiam 516 F.2d 1394 (8th Cir. 1975).

[7]In 1980, the parties agreed that the P.C. would begin paying 10-percent interest on the average annual balance outstanding. We are concerned, however, only with the parties' intent at the time they entered into the transaction. See *Saigh v. Commissioner,* 36 T.C. 395, 420 (1961).

ally obligated to repay the amounts he withdrew from the P.C.

Most important in our view is the fact that petitioner allegedly provided medical services without compensation during the years in issue. Petitioner deposited funds in the P.C.'s account on numerous occasions between March 1976 and February 1979 when he drew a salary from the P.C. The P.C. repaid the advances in full between March 1979 and February 1982 when petitioner continued to render the same services to the P.C., but he received no salary. In *Haber v. Commissioner*, 52 T.C. at 255, a closely held corporation made "loans" to one of its shareholder/ employees over several years but reduced the shareholder/ employee's salary by the amount of the loans. We recharacterized the alleged loans as compensation for services. The same result is mandated in the instant case.

Petitioner would not have agreed to work for no compensation if he had bargained at arm's length with an uncontrolled entity, and we do not believe that he agreed to do so here. He merely used his control over the P.C. to recharacterize his $49,157.93 contribution to the P.C.'s capital account as a series of loans and the P.C.'s salary payments to him as nontaxable loan repayments.[8] In addition, we hold that the $27,400.02 withdrawn by petitioner as "loans" between March 1, 1979, and February 28, 1982, was disguised salary. Petitioner, therefore, had additional income in the form of compensation in the following amounts during each of the years in issue:[9]

| Year | Amount |
|------|--------|
| 1979 | 0 |
| 1980 | $657.75 |
| 1981 | 68,830.59 |

[8]We note that there is no rule of law that requires a corporation to pay salaries before repaying its debts. In this case, however, we have determined that a true debtor-creditor relationship did not exist except with regard to petitioner's initial $56,085.66 loan to P.C. in 1976, and that the payments the P.C. made, therefore, could not be loan repayments.

[9]The P.C.'s corporate records, to which the parties stipulated, show payments from the P.C. to, or on behalf of petitioner between Mar. 1, 1979, and Feb. 28, 1982. There is no indication, however, of which amounts were to repay the $56,085.66 promissory note, which amounts were to repay the other cash advances that petitioner made to the P.C., and which amounts were purported to be loans to petitioner. We treat the P.C. as having first paid off the $56,085.66 promissory note. Because we found the note represented a valid loan, its repayment does not constitute income. The amounts we have attributed to petitioner represent amounts the P.C. paid to petitioner during the years in issue in "repayment" of the cash advances totaling $49,157.93 and as "loans" totaling $27,400.02.

Other evidence of petitioner's general course of nonarm's-length dealing with the P.C. includes withdrawals of cash in 1979, 1980, and 1981, in the amounts of $5,635, $7,906, and $8,558, respectively, from Hilltop without recording the withdrawals on the P.C.'s books. He did not report these amounts as income. We find that the withdrawals were in effect paid by the P.C. as compensation to petitioner.

Next we must determine whether respondent's reallocation of income to petitioner in 1979, 1980, and 1981, is necessary to clearly reflect income. The chief inquiry is whether petitioner's total compensation (including salary, pension plan contributions, and medical reimbursements) after incorporation approximated what he would have received absent incorporation. *Keller v. Commissioner*, 77 T.C. at 1025. Petitioner contends that the inquiry into arm's-length dealing must be made with reference to the entire corporate entity. Respondent argues that we should look only to the P.C.'s Hilltop income and should disregard its other businesses.

In previous cases applying section 482 to physicians who incorporated their medical practices, the corporation's sole business activity was the medical practice. *Pacella v. Commissioner*, 78 T.C. at 604; *Keller v. Commissioner*, 77 T.C. at 1014. We, therefore, looked only to the income from the medical practice to determine whether the corporation and the taxpayer dealt with each other at arm's length. In prior cases in which a taxpayer transferred more than one business to a closely held corporation, however, courts have upheld reallocations of income from one of the corporation's businesses to the taxpayer only after examining the entire corporate entity to determine whether there was arm's-length dealing between the corporation and the taxpayer. See *Borge v. Commissioner*, 405 F.2d 673 (2d Cir. 1968), affg. a Memorandum Opinion of this Court, cert. denied sub nom. *Danica Enterprises, Inc. v. Commissioner*, 395 U.S. 933 (1969); *Ach v. Commissioner*, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966).

In *Borge v. Commissioner*, the taxpayer, a successful entertainer, formed a corporation to which he transferred his unsuccessful poultry business. He also entered into an

employment agreement with the corporation pursuant to which he agreed to perform entertainment services for the corporation in exchange for a fixed salary. The Second Circuit upheld respondent's allocation of most of the entertainment income to the taxpayer because the taxpayer would not have made a similar arrangement in an arm's-length transaction. The Court found that the sole purpose for incorporating was to enable the taxpayer to offset losses from his poultry business against his entertainment income, which he would have been unable to do absent incorporation. *Borge v. Commissioner*, 405 F.2d at 673.

In *Ach v. Commissioner, supra*, the taxpayer sold her successful dress shop to an insolvent corporation owned by her husband and son for inadequate consideration. The corporation had previously operated an unsuccessful dairy business. In upholding respondent's allocation of the dress shop income from the corporation to the taxpayer the Court determined that the parties had not dealt at arm's length and that the sole purpose for transferring the dress shop to the corporation was to enable it to use the defunct dairy business's carryover losses to offset its income. Because the dairy business and dress shop had different owners before incorporation, the loss carryovers could not otherwise have been used. *Ach v. Commissioner*, 42 T.C. at 114.

We now compare petitioner's total compensation and taxable income after incorporation with what he would have received absent incorporation to determine whether he dealt with the P.C. at arm's length. If petitioner had not incorporated, he would have received his distributive share of income as a partner in Hilltop and additional income from the Care Center and Training School. His gross income would have greatly exceeded the salary he received from the P.C. His taxable income also would have exceeded his salary from the P.C., but not so significantly because, unlike the taxpayers in *Borge* and *Ach*, he would have been able to use his losses from his dog and farming businesses to offset his income from his medical practice. Petitioner could not, however, have deducted losses from the restaurant business on his individual income tax return because the restaurant was at all times a separate corporation from the P.C., being its subsidiary, and the subsidiary's loss thus

could never have affected petitioner's individual income.[10]
Cf. *Ach v. Commissioner*, 42 T.C. at 114.

The following schedule adjusts the income of the P.C. for the years in issue to a calendar year basis and eliminates deductions for the restaurant, petitioner's salary, payroll taxes, medical expense reimbursements, deferred compensation, net operating loss carryovers, and dividends received to approximate the taxable income that petitioner would have received absent incorporation:[11]

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Hilltop income | $205,383 | $204,716 | $228,802 |
| Other medical income:[1] |  |  |  |
| January - February | 2,692 | 3,559 | 3,385 |
| March - December | 17,794 | 16,926 | 20,113 |
| Dog and farm income: |  |  |  |
| January - February | 2,265 | 3,231 | 1,909 |
| March - December | 16,158 | 9,542 | 7,358 |
| Interest and dividends: |  |  |  |
| January - February | 37 | 1,059 | 263 |
| March - December | 5,292 | 1,316 | 118 |
| Total income | 249,621 | 240,349 | 261,948 |
| Dog, farm, and medical expenses: |  |  |  |
| January - February | (19,919) | (23,043) | (26,328) |
| March - December | (115,217) | (131,639) | (146,758) |
| Total expenses | (135,136) | (154,682) | (173,086) |
| Adjusted income | 114,485 | 85,667 | 88,862 |

[1]We recognize that respondent does not reallocate the P.C.'s medical income from the Training School and Care Center or the P.C.'s interest and dividend income to petitioner. To determine whether petitioner's income after incorporation was comparable to the income he would have received absent incorporation, however, these amounts must be taken into account or a distorted result would occur.

---

[10]Petitioner contends that absent incorporation, he would have been able to offset the losses from the farm, dog, and restaurant operations against his medical income for each of the years in issue. Respondent could conceivably have argued, pursuant to sec. 183, that petitioner could not have deducted these losses absent incorporation because the farm, dog, and restaurant businesses were not activities engaged in for profit. See, e.g., *Burger v. Commissioner*, 809 F.2d 355 (7th Cir. 1987), affg. a Memorandum Opinion of this Court. Because he has not done so, we accept petitioner's assertion that he could have offset his farm and dog operation losses against his medical income if he had not incorporated. As we state above, however, the restaurant business is a separate corporation from the P.C. and its loss could not have affected petitioner's individual income.

[11]These calculations are based on the assumption that income other than Hilltop income and all expenses are earned or incurred on a pro rata basis during each year. The record does not support any other treatment.

Petitioner's compensation from the P.C. during the years in issue, including amounts withdrawn directly from Hilltop and omitted from petitioner's tax returns was as follows:

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Salary | $44,794 | 0 | 0 |
| "Interest" payments[12] | 0 | 0 | $5,765.05 |
| Medical expense reimbursement: | | | |
| January - February | 121 | $122.00 | 0 |
| March - December | 609 | 0 | 244.00 |
| ESOP Contributions: | | | |
| January - February | 0 | 0 | 0 |
| March - December | 0 | 0 | 2,250.00 |
| Unreported withdrawals from Hilltop | 5,635 | 7,906.00 | 8,558.00 |
| Withdrawals from P.C. | 0 | 657.75 | 68,830.59 |
| Total income | 51,159 | 8,685.75 | 85,647.64 |

Petitioner thus received 45 percent of the income that he would have received absent incorporation in 1979, 10 percent in 1980, and 96 percent in 1981.

In previous cases involving physicians who incorporated their medical practices, we found that it would be reasonable for a high bracket taxpayer to accept employment with an uncontrolled corporation at a lower salary because of the benefits available through a corporation, such as a tax-deferred pension plan. To a high bracket taxpayer, pension plan contributions may be worth more than the equivalent amount as an outright payment. *Pacella v. Commissioner*, 78 T.C. at 621; *Keller v. Commissioner*, 77 T.C. at 1028-1029. The existence of pension plans was a significant factor in our holdings that respondent's section 482 allocations were unreasonable in those cases. In *Pacella* and *Keller*, the taxpayers' average earnings in each year after they incorporated their medical practices were approximately 86 percent and 87 percent, respectively, of what they would have earned absent incorporation. In both cases, however, 35 percent of each taxpayer's total compensation

---

[12]Although the payment petitioner received from the P.C. in 1981 was not interest because the underlying transactions were not loans, the payment was additional compensation to petitioner in that year.

from his corporation during the years in issue was in the form of pension plan contributions.

In the present case, after petitioner incorporated his medical practice and other businesses, he received 45 percent and 10 percent in 1979 and 1980, respectively, of the income that he would have received absent incorporation. A taxpayer dealing at arm's length would not have accepted employment at a salary so significantly lower than he could otherwise earn. In 1981, in contrast, petitioner received 96 percent of the income he would have received absent incorporation and that amount included an ESOP contribution of $2,250. We find that petitioner's compensation from the P.C. in 1981 was comparable to the amount he would have received absent incorporation.

Section 1.482-2(b)(1), Income Tax Regs., provides that when one member of a group of controlled entities performs services on behalf of another member of the group for less than an arm's-length charge, respondent may make allocations to reflect an arm's-length charge for such services.[13] An arm's-length charge for services is the amount that would have been charged for the same or similar services in a transaction between unrelated parties. Sec. 1.482-2(b)(3), Income Tax Regs. Petitioner would not have accepted employment in 1979 and 1980 for so much less than he otherwise could have earned if he had been dealing at arm's length with an unrelated party. We, therefore, uphold respondent's section 482 allocation to the extent of $63,326 in 1979 and $76,981.25 in 1980, the difference between the amount of compensation petitioner would have received in each year absent incorporation and the amount he actually received.[14]

---

[13]We note that sec. 1.482-2(b)(1), Income Tax Regs., applies to a group of controlled "entities" while sec. 1.482-1(b)(1), Income Tax Regs., describing the scope and purpose of sec. 482, refers to a group of controlled "taxpayers." We believe that the difference in language is insignificant. Petitioner and the corporation are thus both "controlled entities" and "controlled taxpayers" and we may properly allocate additional compensation to petitioner to reflect arm's-length dealing.

[14]In this fully stipulated case, the parties request us to decide whether a "thirty day letter" and attached revenue agent's report prepared by respondent before the issuance of the notice of deficiency are admissible into evidence. Petitioner asks us to admit the letter and report to show the basis for the deficiency determination. Respondent objects on the ground that the report and letter are irrelevant as attempts to go beyond the notice of deficiency. See *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324 (1974). We admit the letter and report, but only for the limited purpose of showing the basis for the deficiency determination, and not as proof of the facts contained therein. See *Fitzner v. Commissioner*, 31 T.C. 1252 (1959).

To reflect the foregoing,

*Decision will be entered under Rule 155.*