T.C. Memo. 1998-83


UNITED STATES TAX COURT


ROBERT G. RUCKMAN AND JULIE RUCKMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 976-95.                    Filed February 25, 1998.


<u>C. Page Hamrick III,</u> for petitioners.

<u>William Henck</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes and an accuracy-related penalty as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(b)(1) |
|------|------------|------------------------------------------|
| 1989 | $6,006 | -- |
| 1990 | 6,728 | -- |
| 1991 | 12,884 | $1,520 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether amounts paid for certain truck dispatch services performed by petitioners are attributable to petitioners' wholly owned S corporation or to petitioner Julie Ruckman and thus subject to self-employment tax; (2) whether petitioners are entitled to depreciation deductions in the amount of $12,285 for each of the years 1990 and 1991; and (3) whether petitioners are liable for an accuracy-related penalty under section 6662(b)(1) for failing to report certain income in 1991.[1]

                        FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioners Robert G. Ruckman (Mr. Ruckman) and Julie Ruckman (Mrs. Ruckman) are husband and wife who resided in Leivasy, West Virginia, at the time their petition was filed.

---

[1]Respondent made determinations with respect to petitioners' wholly owned S corporation, Robert Ruckman, Inc., at the shareholder level, as provided for in sec. 301.6241-1T(c)(2), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3002 (Jan. 30, 1987). The parties have not disputed this aspect of the determination.

Petitioners filed joint Federal income tax returns for the years at issue.

Petitioners formed Robert Ruckman, Inc. (Ruckman, Inc.), as a West Virginia corporation in 1980 and were each 50-percent shareholders during the years at issue. Mr. Ruckman served as president and Mrs. Ruckman as secretary and treasurer. During the years in issue, Ruckman, Inc., operated a trucking business with a fleet of four to five trucks used for hauling freight for customers. Ruckman, Inc., maintained an office in a spare room in petitioners' residence. Ruckman, Inc., filed Federal income tax returns on Forms 1120S as an S corporation for the years in issue.

Mrs. Ruckman performed the "office work" for Ruckman, Inc., including keeping the books and records and other administrative duties, such as securing appropriate permits for truck hauling. Although Mr. Ruckman had initially driven trucks for Ruckman, Inc., he ceased doing so after a heart attack in 1986 and thereafter performed maintenance work for the company and various other duties, as discussed below.

During the years at issue, Ruckman, Inc., provided hauling services to Bennett Logging, Inc. (Bennett Logging), a logging and trucking business run by Gordon Bennett. Since Mr. Bennett also drove a truck for Bennett Logging and did not maintain an office, he was unable to devote sufficient attention to the dispatching duties entailed in running a trucking business, in

petitioners' view. At various times during either 1987 or 1988, petitioners and Mr. Bennett discussed having petitioners perform the dispatch services that were required in the operation of the trucking business of Bennett Logging. Such dispatch services consisted of procuring loads to be hauled, scheduling pickup and delivery, assigning loads to particular trucks, verifying delivery, answering drivers' questions about truck mechanical problems, giving drivers instructions regarding proper loading of unusual commodities, arranging for required licensing for transit of trucks through various jurisdictions and similar administrative matters, and billing. Dispatch services sometimes entailed on-site visits to customers, but consisted primarily of office work involving paperwork and telephoning.

Sometime between 1987 and 1989, petitioners began performing dispatch services for Bennett Logging and continued to do so during the years at issue. Mrs. Ruckman performed most, but not all, of the dispatch services. Mr. Ruckman fielded drivers' calls regarding mechanical problems and proper loading and made the on-site visits to customers that were required. Mrs. Ruckman generally did the remainder. The Ruckmans' two adult children also occasionally assisted during the years in issue.

As required by then-applicable Interstate Commerce Commission regulations, the contract between Ruckman, Inc., and Bennett Logging for hauling services was written. There was no

written agreement with Bennett Logging regarding the dispatch services performed by petitioners.

For each of the years in issue, Bennett Logging issued Forms 1099 to Ruckman, Inc., for the amounts paid for hauling services. With respect to the dispatch services performed by petitioners, Bennett Logging issued Forms 1099 to Mrs. Ruckman personally covering the amounts paid for such services in each of the years in issue. The checks for dispatch services were made out to Mrs. Ruckman personally and were deposited into petitioners' personal bank account, rather than the corporate bank account.

Petitioners did not draw any salary or wages from Ruckman, Inc., during the years in issue.

The amounts that Bennett Logging paid with respect to dispatch services performed by petitioners totaled $43,009 and $31,162 in 1989 and 1990, respectively. For 1989 and 1990, Ruckman, Inc., reported the respective amounts on its Federal income tax returns, Forms 1120S.

With respect to 1991, petitioners reported the amounts paid by Bennett Logging with respect to dispatch services they performed on Schedules C and SE of their joint return, Form 1040, as Mrs. Ruckman's net earnings from self-employment as a dispatcher. Also with respect to 1991, Happy Trucking, Inc. (Happy Trucking), a corporation owned by Mr. Bennett and Mr. Ruckman, issued a Form 1099 to Ruckman, Inc., for both dispatch

and hauling services. The dispatch services portion of the payments was $18,063, which was deposited into petitioners' personal bank account. Petitioners conceded that neither Ruckman, Inc., nor petitioners reported the $18,063 in payments for dispatch services from Happy Trucking on their Federal income tax returns for 1991.

Mrs. Ruckman maintained both Ruckman, Inc.'s and petitioners' financial records during the years at issue. She kept spreadsheets listing income and expenses on handwritten columnar pads. For each of the years in issue, Mrs. Ruckman delivered the spreadsheets, bank account information, and Forms 1099 to Stanley Adkins, a certified public accountant, in order for Mr. Adkins to prepare Federal income tax returns for petitioners and for Ruckman, Inc. Mr. Ruckman relied on Mrs. Ruckman to manage petitioners' and Ruckman, Inc.'s financial records and did not participate in these matters to any significant degree.

In June 1991, Mrs. Ruckman was diagnosed with cancer and underwent surgery in that month and again in July 1991. Mrs. Ruckman then commenced radiation and chemotherapy treatments in August 1991. The radiation treatments lasted through September 1991 and the chemotherapy through March 1992. These treatments required almost daily trips to Roanoke, Virginia, and prevented Mrs. Ruckman from performing her regular work. Mr. Ruckman and

petitioners' two adult children took over Mrs. Ruckman's normal duties during the period of her cancer treatments.

In 1986, Ruckman, Inc., purchased a 1986 Freightliner truck for $86,000 and began to depreciate it over a 7-year period using the straight line method. In May 1990, the truck was involved in an accident and sustained substantial damage, rendering it inoperable. As a consequence of the damage to the truck, Ruckman, Inc., initially received $37,000 in insurance proceeds in 1990 and later an additional $11,000, bringing the total received to $48,000 in that year.[2] Ruckman, Inc.'s adjusted basis in the truck at the close of the year preceding the year of the accident (12/31/89) was $42,576.[3] Petitioners considered the

---

[2]Mr. Ruckman testified, and petitioners on brief sought a finding of fact to which respondent did not object, that Ruckman, Inc., initially received $37,000 from its insurance company, and later an amount bringing the total settlement to $48,000, as a result of the damage to the truck. With respect to the time of receipt, the record establishes that $37,000 of the insurance proceeds was received in 1990. Respondent so determined in the notice of deficiency, and petitioners nowhere dispute it. The record is not entirely clear as to when the additional $11,000 in insurance proceeds, which brought the total to $48,000, was received. Petitioners' proposed finding of fact is that the insurance company "later" settled for a total payment of $48,000 after initially paying $37,000. Given that the accident occurred in May of 1990, and the significance of the truck and the dollar amounts involved to Ruckman, Inc.'s business, the likelihood is great that the remaining insurance proceeds were received before the end of 1990, more than 7 months later. We accordingly find, in the absence of any further evidence, that all insurance proceeds were received in 1990.

[3]Respondent so determined in the notice of deficiency, and petitioners have not disputed this figure.

truck to be repairable. They kept the truck and title thereto, intending to repair it, but it was not repaired or further used after the accident. The truck was not scrapped or used as a source for parts. The truck was not transferred to a scrap account, but instead kept on the depreciation schedule of Ruckman, Inc., which took depreciation expenses of $12,285 in each of the years 1990 and 1991 with respect to the truck.

OPINION

1. Dispatch Income

Respondent determined that amounts paid by Bennett Logging for dispatch services in 1989 and 1990 were incorrectly reported as income by Ruckman, Inc., for those years and instead were required to be reported on petitioners' returns as self-employment income of Mrs. Ruckman, subject to self-employment tax. Petitioners contend that these amounts were properly reported as Ruckman, Inc.'s income.[4] Similarly, respondent determined that $18,063 paid by Happy Trucking in 1991 for dispatch services was unreported and should have been reported on petitioners' returns as self-employment income of Mrs. Ruckman. Petitioners concede that $18,063 in income was received but not reported in 1991, but contend that this amount should be reported as income of Ruckman, Inc.

---

[4]The parties appear to be in agreement that these amounts, if income of Ruckman, Inc., would not be subject to self-employment tax under sec. 1401 when passed through to petitioners. Cf. Ding v. Commissioner, T.C. Memo. 1997-435.

On brief, respondent argues that the facts of this case demonstrate that the payments from third parties for dispatch services were received by Mrs. Ruckman as income from a "separate business" from that of Ruckman, Inc., and the payments are therefore attributable to her and subject to the self-employment tax imposed by section 1401. As legal authority for his position, respondent cites Commissioner v. Culbertson, 337 U.S. 733 (1949), suggesting that the assignment of income doctrine is at issue in this case. Respondent further cites Joseph Radtke, S.C. v. United States, 712 F. Supp. 143 (E.D. Wis. 1989), affd. per curiam 895 F.2d 1196 (7th Cir. 1990), and Spicer Accounting, Inc. v. United States, 918 F.2d 90 (9th Cir. 1990), for the proposition that we should "determine the economic reality" presented by the facts and circumstances of this case.

We do not believe that Radtke and Spicer provide a coherent theory for sustaining the deficiency determined with respect to self-employment taxes. Those cases involve the recharacterization of S corporation dividends as wages subject to employment taxes imposed by sections 3111 and 3301. The notice of deficiency in the instant case does not seek to recharacterize dividends from Ruckman, Inc., as wages of Mrs. Ruckman subject to employment taxes, but instead proceeds on the quite different theory that Mrs. Ruckman earned these amounts directly, subjecting them to self-employment tax, and that petitioners' efforts to attribute such income to their wholly owned

corporation are unavailing under the facts of this case.

Petitioners cite no legal authority and argue that the issue in this case is entirely a question of fact. They maintain that the dispatch services were performed pursuant to contracts which the service recipients had with Ruckman, Inc., not with Mrs. Ruckman individually; that Mrs. Ruckman did not and could not perform all of the specific duties encompassed in providing dispatch services; that both Mr. Ruckman and Mrs. Ruckman, as well as their two adult children on occasion, actually performed the dispatch services, but only through and on behalf of Ruckman, Inc., using the corporation's facilities to do so.[5]

We believe the parties' dispute requires us to decide whether Ruckman, Inc., or one or both of petitioners was the true earner of the dispatch income. We agree in part with respondent that the assignment of income doctrine[6] is raised herein or, more specifically, the recurrent issue of determining the true earner of income as between a corporation and its service-performing agent or shareholder. In these circumstances, because two important income tax principles compete--namely, income must be

---

[5]In their petition, petitioners make the further assertion that for the years in issue they were "not themselves engaged in business other than as employees of the corporation [Ruckman, Inc.]". Perhaps sensing some of the difficulties of that position, petitioners on brief do not anywhere use the term "employee" to characterize their relationship with Ruckman, Inc.

[6]See, e.g., United States v. Basye, 410 U.S. 441, 449 (1973); Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. 111, 114-115 (1930).

taxed to its true earner, Commissioner v. Culbertson, supra at 739-740; Lucas v. Earl, 281 U.S. 111, 114-115 (1930), and a validly organized and operated corporation's existence must be recognized for tax purposes, Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943)--a determination of the true earner requires a more refined inquiry than merely pointing to the actual performer of the services. Johnson v. Commissioner, 78 T.C. 882, 890-891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984). Instead, we must determine, as between the corporation and its service-performing agent or shareholder, who controls the earning of the income. Id. at 891, and cases cited therein. A two-part test must be satisfied before the corporation, rather than its service-performing agent or shareholder, will be considered to control the earning of the income. First, the service provider must be the employee of the corporation, whom the corporation has the right to direct and control in some meaningful sense. Second, there must exist between the corporation and the service recipient a contract or similar indicium recognizing the corporation's controlling position. Haag v. Commissioner, 88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); Johnson v. Commissioner, supra at 891; see also Leavell v. Commissioner, 104 T.C. 140, 151-152 (1995).

On the basis of the evidence in this case, we do not believe that petitioners can meet either component of the test. First,

as to whether Mrs. Ruckman (or Mr. Ruckman) was an employee of Ruckman, Inc., whom the corporation had the right to direct and control in some meaningful sense, we believe the available evidence overwhelmingly supports the conclusion that no employment relationship existed between Ruckman, Inc., and either petitioner insofar as the provision of dispatch services was concerned.[7] We note first that there was no written contract of employment between Ruckman, Inc., and either petitioner from which we might discern control, and the available extrinsic evidence indicates that Ruckman, Inc., did not have control. Ruckman, Inc., did not pay any salary or wages to either petitioner with respect to the dispatch services or otherwise. Payment for the dispatch services was made by checks payable to Mrs. Ruckman personally, and these checks were deposited into petitioners' personal banking account, not the corporate account. Thus, at no point did Ruckman, Inc., have custody or control of the remuneration for the dispatch services. Cf. <u>Gordon v. Commissioner</u>, T.C. Memo. 1993-10 (checks issued to taxpayer

---

[7]We note that the focus of our analysis in <u>Leavell v. Commissioner</u>, 104 T.C. 140 (1995), was whether an employment relationship existed between the service provider taxpayer and the <u>service recipient</u>, on the theory that only a service provider who is an independent contractor with respect to the service recipient retains the right to grant control over his services to an intermediate entity. <u>Id.</u> at 149-150. In the instant case, however, it has not been argued, nor do we believe there is any evidence to suggest, that either petitioner was an employee of Bennett Logging or Happy Trucking, the recipients of the dispatch services. Thus, petitioners retained the capacity to grant control of their dispatch services to Ruckman, Inc., and our analysis concerns whether they did so under the two-part test.

personally and taxpayer's personal use of proceeds support conclusion that taxpayer rather than his corporation was true earner). Perhaps most telling, although the dispatch payments from Bennett Logging were reported as income on Ruckman, Inc.'s returns in 1989 and 1990, the same payments were reported in 1991 on petitioners' joint return as Mrs. Ruckman's self-employment income as a dispatcher. Petitioners have not asserted, nor is there any evidence to suggest, that there was any change in the contractual relationships among Bennett Logging, petitioners, or Ruckman, Inc., between 1990 and 1991.[8] We believe the conclusion is inescapable that petitioners ignored the corporate existence of Ruckman, Inc., with respect to the earning of income from dispatch services. For these same reasons, we do not believe the evidence can support a finding that either petitioner acted as an agent of Ruckman, Inc., with respect to the earning of the dispatch income. Accordingly, we conclude that Ruckman, Inc., did not have the right to direct and control either petitioner in any meaningful sense with respect to the dispatch income.[9]

---

[8]The other payments received in 1991 for dispatch services, from Happy Trucking, were not reported on either petitioners' or Ruckman, Inc.'s return.

[9]We note that as officers of Ruckman, Inc., petitioners may have been employees of the corporation pursuant to sec. 3121(d)(1). However, the services they may have rendered in their capacity as officers are distinguishable from the dispatch services rendered to third parties, with which we are here concerned. See Idaho Ambucare Ctr., Inc. v. United States, 57 F.3d 752, 755-756 (9th Cir. 1995); Rev. Rul. 82-83, 1982-1 C.B. 151.

As for the second prong of the test, namely, that there must exist between the corporation and the person using the services a contract or similar indicium recognizing the corporation's controlling position, we believe the substantial weight of the evidence indicates that the service recipients, Bennett Logging and Happy Trucking, did not recognize Ruckman, Inc., as having a controlling position with respect to the dispatch services. Again, there was no written contract for dispatch services between Ruckman, Inc., and either Bennett Logging or Happy Trucking. Bennett Logging's checks for dispatch services were made out to Mrs. Ruckman personally. For the 3 years at issue, Bennett Logging issued Forms 1099 to Mrs. Ruckman personally with respect to the payments for dispatch services, while in the same years it issued Forms 1099 to Ruckman, Inc., with respect to payments for hauling services. Cf. Zadan v. Commissioner, T.C. Memo. 1993-85 (Forms 1099 issued to taxpayer personally support conclusion that taxpayer rather than his corporation was true earner). At trial, the parties jointly stipulated a written statement of Gordon Bennett, as president of Bennett Logging, in which he asserts that the "administration" of the trucking branch of Bennett Logging, and subsequently of Happy Trucking, which he further describes as consisting of the services that have been characterized herein as dispatch services, "was the responsibility of Robert Ruckman, Inc." and that "Due to an error, 1099's were issued to Julie Ruckman." The statement is

dated approximately 1 month before the trial of this case. Although respondent did not pose a hearsay objection to the statement, we nonetheless accord greater weight to the contemporaneous actions of Bennett Logging, in which a distinction was maintained in the preparation of Forms 1099 as between payments to Ruckman, Inc., for hauling services, and payments to Mrs. Ruckman personally for dispatch services.[10] Happy Trucking did issue a Form 1099 to Ruckman, Inc., rather than Mrs. Ruckman, for dispatching services in 1991, although the Happy Trucking payments were not reported by either Ruckman, Inc., or petitioners. To the extent that dispatch payments were reported in 1991, they were reported by petitioners on Schedule C of their joint return, as the self-employment income of Mrs. Ruckman. On balance, we conclude that the manner in which the service recipients generally paid and, for tax purposes, accounted for the payments for dispatch services negates the proposition that they recognized Ruckman, Inc.'s controlling position with respect to earning income from the dispatch services.

Petitioners argue that they always considered themselves to be conducting all business activities, including the provision of dispatch services to third parties, only through Ruckman, Inc.,

---

[10]We note also that Mr. Bennett's statement offers no explanation to account for the fact that Bennett Logging's checks for dispatch services were made out to Mrs. Ruckman personally.

using Ruckman, Inc.'s facilities.[11]  Mrs. Ruckman testified that she did not consider it significant that payment checks and Forms 1099 with respect to dispatch services were issued to her personally rather than to Ruckman, Inc., in particular because the payments were being reported as income of their corporation, and passed through to them.  Although petitioners may have some frustration with the formalities here, the fact remains that the corporation--which is, itself, a mere legal fiction--never had even transitory control of the funds that petitioners would have us attribute to it.  Moreover, there are more than formalities at stake here.  By treating the payments for dispatch services as earned by their corporation, which paid them no salaries, petitioners treated income that was from their personal services as subject to neither employment nor self-employment taxes.  On the basis of the evidence, we conclude that the income from dispatch services is not attributable to Ruckman, Inc.

Respondent determined that the dispatch income was earned by Mrs. Ruckman personally.  Petitioners allege error because the dispatch services were not all rendered solely by Mrs. Ruckman.  Although we have found that Mr. Ruckman performed a portion of the dispatch services, we do not believe this fact demonstrates

---

[11]Petitioners' argument that the dispatch services were performed using the corporation's facilities boils down to the claim that the corporation's office, a spare room in their residence, and the corporation's office equipment were used. There is no evidence, and we very much doubt, that Ruckman, Inc., held title to petitioners' residence.  There is likewise no evidence of the ownership of the office equipment.

error in respondent's determination.  All checks for dispatch services were made out to Mrs. Ruckman, and all Forms 1099 were issued to Mrs. Ruckman, except one for 1991 prepared by Happy Trucking.  Moreover, petitioners took the position on their 1991 return that the dispatch income was earned by Mrs. Ruckman personally.  We thus conclude that Mrs. Ruckman controlled the earning of the dispatch income that was paid by Bennett Logging in 1989 and 1990, and by Happy Trucking in 1991, notwithstanding any assistance given her by Mr. Ruckman, or by the Ruckmans' adult children.

Finally, respondent made a determination that the income determined to be attributable to Mrs. Ruckman was subject to the tax on self-employment income under section 1401.  Other than to claim that the dispatch income was attributable to Ruckman, Inc., petitioners have not addressed respondent's determination under section 1401.  We accordingly sustain it.

2.  Truck Depreciation

In the notice of deficiency, respondent disallowed depreciation deductions in the amount of $12,285 for each of the years 1990 and 1991 that had been taken by Ruckman, Inc., with respect to the 1986 Freightliner truck and instead determined that the corporation sustained a casualty loss in the amount of $5,576 in 1990, the year in which the truck was wrecked.  The casualty loss was computed as the excess of Ruckman, Inc.'s adjusted basis as of the close of the year preceding the year of

the accident ($42,576) over what respondent determined to be the insurance proceeds ($37,000).

Petitioners contend that the disallowance of the depreciation deductions was erroneous because there was no "retirement" of the asset within the meaning of section 1.167(a)-8, Income Tax Regs., which defines retirement as "the permanent withdrawal of depreciable property from use in the trade or business". Petitioners argue that because Ruckman, Inc., continued to hold title to the truck and Mr. Ruckman intended to repair it, the truck was not permanently withdrawn from use. As a result, petitioners contend that Ruckman, Inc., was entitled to continue taking the same depreciation deductions in 1990 and 1991 as had been taken in previous years, without regard to the truck's wrecked condition or, impliedly, the insurance proceeds received.

We disagree. Ruckman, Inc.'s adjusted basis in the truck at the close of the year preceding the accident was $42,576. As a consequence of the damage to the truck, Ruckman, Inc., initially received $37,000 in insurance proceeds in 1990, and later an additional $11,000, bringing the total received to $48,000 in that year. Given that Ruckman, Inc., received insurance proceeds of $48,000 as compensation for damage to a truck with an adjusted basis of $42,576, on which no repairs had been made or attempted either in the remaining 7 months in 1990 or in 1991, we conclude that petitioners were not entitled to the depreciation deductions

they claimed for 1990 and 1991.  Rather, receipt of the insurance proceeds without repair to the truck required Ruckman, Inc., to make a downward adjustment to its basis in the truck under section 1016.  Indeed, the insurance proceeds received by Ruckman, Inc., exceeded its basis in the truck, which would preclude any casualty loss as a result of the accident and would instead ordinarily produce taxable gain.  However, because respondent has not sought to amend the pleadings to assert an increased deficiency, we will sustain the determination that petitioners sustained a casualty loss of $5,576 in 1990.

## 3.  Negligence

Respondent determined that petitioners were liable for an accuracy-related penalty pursuant to section 6662(b)(1) on the basis of their failure to report $18,063 in dispatch income for 1991 that was received from Happy Trucking and reported on a Form 1099 issued to Ruckman, Inc.  Respondent argues that petitioners are liable for the accuracy-related penalty under section 6662(b)(1), which imposes the penalty on the portion of an underpayment which is attributable to "Negligence or disregard of rules or regulations."  Petitioners argue that the penalty should not apply because the omission from reported income, which they concede occurred, resulted from Mrs. Ruckman's incapacitation due to illness.

"Negligence" for these purposes includes "any failure to make a reasonable attempt to comply with the provisions of [the

Internal Revenue Code]".  Sec. 6662(c).  Under the regulations, negligence is "strongly indicated" where a taxpayer fails to include on an income tax return an amount of income shown on an information return.  Sec. 1.6662-3(b)(1)(i), Income Tax Regs. However, the accuracy-related penalty will not be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause and that the taxpayer acted in good faith.  Sec. 6664(c)(1).  The determination of whether there was reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.

The taxpayer's mental and physical condition, as well as sophistication with respect to the tax laws, at the time the return was filed have been considered in determining whether the negligence penalty should apply.  Gray v. Commissioner, T.C. Memo. 1982-392; see also Carnahan v. Commissioner, T.C. Memo. 1994-163 (mentally incapacitated and disabled taxpayer was not liable for various additions to tax including negligence), affd. without published opinion 70 F.3d 637 (D.C. Cir. 1995).

It was Mrs. Ruckman who maintained the books and financial records for both Ruckman, Inc., and petitioners personally, and who provided the information to and consulted with petitioners' accountant for purposes of his preparation of the tax returns of Ruckman, Inc., and petitioners.  Mr. Ruckman testified credibly that he understood very little regarding petitioners' financial

records or tax returns, that he relied on Mrs. Ruckman for these matters, and that he has done so for some time. The testimony of petitioners' accountant corroborates the foregoing.

In 1991, the only year in which an omission of income occurred, Mrs. Ruckman was diagnosed with cancer, underwent surgery twice, and commenced radiation and chemotherapy treatments that extended through March 1992, when the 1991 tax returns for Ruckman, Inc., and petitioners were completed.[12] With respect to this period, and the failure to report the Happy Trucking dispatch income, Mrs. Ruckman testified that "I didn't know for a couple of years really how much had gotten away from me, because I didn't know that I wasn't capable of what I was trying to do." As to Mr. Ruckman, we assess his responsibilities with respect to the omitted income in light of his established practice of relying on his wife for record keeping and the undoubted impact on him of having a spouse battling a life-threatening illness during the period. In the circumstances of this case, we conclude that petitioners acted in good faith and had reasonable cause in failing to report the income at issue. Accordingly, we will not sustain respondent's determination of the accuracy-related penalty under section 6662(b)(1).

Decision will be entered

under Rule 155.

---

[12]The signature dates on Ruckman, Inc.'s 1991 tax return and on petitioners' personal joint return for that year indicate that both returns were signed in March 1992.