T.C. Memo. 2015-89

UNITED STATES TAX COURT

IAN D. HUGHES AND VANESSA S. HUGHES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14581-11.                    Filed May 11, 2015.

R determined a deficiency in Ps' Federal income tax for tax year
2001 on the basis of their amended 2001 Federal income tax return.
R further determined an addition to tax under I.R.C. sec. 6651(a)(1)
for failure to timely file the original 2001 return and an accuracy-
related penalty under I.R.C. sec. 6662. In an amendment to answer R
asserted, for the first time, a gross valuation misstatement penalty
under I.R.C. sec. 6662.

The parties settled all issues related to the deficiency except one:
On their original return Ps claimed zero bases in shares of K stock
sold in February 2001 and recognized long-term capital gain. They
also reported a substantial capital loss from an unrelated transaction.
On the amended return Ps reduced their reported loss from the
unrelated transaction. They also increased their claimed bases in the
K shares and reduced the gain from the K shares' sale. Ps contend
that P-H, who is and was a U.S. citizen and who was then a U.K.
resident, gave the K shares to P-W, who was then a U.K. citizen and
resident, in December 2000 and January 2001; that P-W took a fair

[*2] market value basis in the shares; and that Ps accordingly recognized the reduced amount of gain reported on their amended return when the K shares were sold. R contends that P-H did not make a completed gift to P-W and that Ps had zero bases in the K shares when they were sold.

Held: Regardless of whether P-H transferred the K shares to P-W for U.S. tax purposes before their sale, Ps had zero bases in the K shares when they were sold.

Held, further, Ps are liable for the I.R.C. sec. 6662(a), (b)(3), (e), and (h) gross valuation misstatement penalty with respect to any underpayment of tax attributable to their overstatement of bases in the K shares on their amended 2001 tax return.

Held, further, Ps are not liable for the I.R.C. sec. 6662(a) accuracy-related penalty for negligence or disregard of rules and regulations but are liable for the penalty for any substantial understatement of income tax with respect to the balance of any underpayment.

Sonia M. Agee, for petitioners.

Jonathan E. Behrens and Gerald A. Thorpe, for respondent.

[*3]     MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:[1]  Respondent determined a Federal income tax deficiency of $364,006 for petitioners' taxable year 2001 on the basis of the amended return petitioners filed on February 4, 2005.  Respondent also (1) determined a $36,400.60 section 6651(a)(1)[2] addition to tax for failure to timely file the original tax return (late-filing addition), (2) determined an accuracy-related penalty under section 6662(a) of $147,286, and (3) asserted in his amendment to answer filed February 26, 2014, a section 6662(a), (b)(3), (e), and (h) gross valuation misstatement penalty.  Before trial the parties settled with regard to all but one of the noncomputational adjustments that contributed to the determined deficiency (settled issues).  The parties litigated that remaining adjustment at trial.  The parties also settled the late-filing addition and agreed on the accuracy-related penalty applicable to the portion of petitioners' underpayment that was attributable

---

[1]Judge Diane Kroupa tried this case on May 6, 2014, and retired from the Tax Court on June 16, 2014.  With the parties' agreement, the case was reassigned to Judge Robert A. Wherry, Jr., for the purpose of rendering an opinion.

[2]All section references are to the Internal Revenue Code (I.R.C.) of 1986, as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*4]** to one of the settled issues.  The remaining penalties were litigated.  Taking

into account the settled issues,[3] the issues presented for decision are:

---

[3]In the notice of deficiency respondent determined that petitioners received but did not report a California income tax refund; petitioners conceded this issue. Respondent also disallowed (1) certain temporary living, travel and transportation, and automobile expense deductions and an ordinary loss deduction petitioners claimed on Schedule E, Supplemental Income and Loss, (2) petitioners' claimed short-term capital loss deduction attributable to fees incurred to enter into a tax shelter transaction, (3) petitioners' claimed long-term capital loss deduction on their sale of a former residence, (4) a portion of petitioners' claimed mortgage interest deduction, and (5) petitioners' claimed investment interest expense deduction.  Each party conceded some of these issues in whole or in part.  The parties also stipulated a 20% accuracy-related penalty with respect to item (2).

The notice of deficiency refers to the amounts of short-term capital loss and long-term capital gain reported on petitioners' 2001 Form 1040X, Amended U.S. Individual Income Tax Return, rather than those reported on their original 2001 return.  Although respondent thus evidently accepted petitioners' amended return, he nevertheless determined in the notice that it was not a qualified amended return within the meaning of sec. 1.6664-2(c)(3), Income Tax Regs.  Petitioners implicitly challenged this determination in their petition.  Whether petitioners' 2001 Form 1040X was a qualified amended return could, in abstract, affect their liability for the penalties that remain at issue.  See sec. 1.6664-2(c)(2), Income Tax Regs. (providing that additional tax shown on a qualified amended return may reduce the underpayment upon which any penalty will be calculated).  Petitioners' original and amended returns showed precisely the same amount of tax, however, so even if the amended return was a qualified amended return, they have not shown or proven any salutary effect on their penalty liability.

Although in the notice of deficiency respondent premised his deficiency determination and the underlying adjustments on the numbers reported in petitioners' amended tax return, he nevertheless determined a 40% gross valuation misstatement penalty with respect to the short-term capital loss deduction from the tax shelter transaction as petitioners reported it on their original return.  The parties subsequently stipulated a reduced penalty of 35%.  Since the trial and filing of the briefs the parties have responded to an order of the Court pointing out

(continued...)

[*5] (1) whether petitioner husband Ian Hughes transferred ownership, for U.S. tax purposes, of certain shares of stock in KPMG Consulting, Inc. (KCI), to petitioner wife Vanessa Hughes (Mrs. Hughes) before the sale of those shares (KCI shares) in February 2001;

(2) if so, whether Mrs. Hughes took bases greater than zero in the KCI shares;

(3) whether petitioners are liable for the section 6662(a), (b)(3), (e), and (h) gross valuation misstatement penalty with respect to the portion of any underpayment of income tax for the 2001 taxable year that is attributable to an overstatement of bases in the KCI shares; and

(4) whether petitioners are liable for a section 6662(a) accuracy-related penalty with respect to any underpayment of income tax for the 2001 taxable year on the basis of a substantial valuation misstatement, negligence or disregard of rules and regulations, and/or a substantial understatement of income tax.

---

[3](...continued)
various inconsistencies in their stipulations and computations and requesting clarification. They now concur that this stipulation is moot and that no portion of any underpayment redetermined in this proceeding will be attributable to any valuation misstatement on petitioners' original return.

**[*6]**                                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The parties'
stipulation of facts, their three written stipulations of settled issues, and the
additional stipulation of settled issues that was read into the record, at trial, are
incorporated herein by this reference.  Petitioners, Ian and Vanessa Hughes, lived
in Portugal when they filed their petition.

I.      Petitioners' Background

Ian and Vanessa Hughes married on October 20, 2000, and remained
married through the time of trial.  During 2000 and 2001 Mrs. Hughes was a
citizen of the United Kingdom (U.K.).  The United States granted her conditional
U.S. permanent resident status as of January 16, 2001.  Petitioner Ian Hughes is,
and was during 2000 and 2001, a U.S. citizen.  During 2000 and until January 16,
2001, he was a U.K. resident.  Both Mr. and Mrs. Hughes became U.S. residents
on January 16, 2001.

The Hugheses' joint 2001 Federal income tax return identified Mrs.
Hughes' occupation as "HOMEMAKER".  Mr. Hughes made his career as a tax
accountant.  After majoring in business administration and receiving a bachelor of
arts degree from the University of Toronto in 1974, he earned a bachelor of law
degree from the College of Law London in 2000.  Mr. Hughes obtained a certified

[*7] public accountant's (C.P.A.) license in Texas in 1979 and took a job with KPMG LLP (KPMG). He was employed by KPMG from 1979 until he retired on January 15, 2007.

During his tenure at KPMG Mr. Hughes rose through the ranks and moved among KPMG's international offices. Between September 1979 and 1994 he worked in the firm's international tax group in Houston, Chicago, and Toronto, earning promotions from staff accountant to manager, from manager to senior manager, and finally, in 1986, to partner. During this period his duties shifted from preparing corporate and partnership Federal income tax returns to advising clients, particularly publicly traded corporations. Mr. Hughes also began to specialize in the international aspects of subchapter C of the Code and cross-border transactions, particularly mergers and acquisitions (M&A). He returned to the Chicago office and continued with his transactional work for publicly traded corporations.

In 1994 Mr. Hughes moved again, this time to London. There, as partner in charge of KPMG's corporate tax practice, he advised British and other European corporations on the U.S. tax consequences of M&A. In April 1998, while working in London, Mr. Hughes married Brenda Hughes. Five months later, having concluded that Brenda Hughes had married him solely for financial reasons, he

[*8] separated from her. Their divorce was finalized on or about September 25, 2000, and a court decision with respect to the property settlement was entered in October 2000. Shortly after the divorce was final, Mr. Hughes married Vanessa, the current Mrs. Hughes, on October 20, 2000. During 2000 Mr. Hughes also learned that KPMG wanted to transfer him yet again, this time to California.

When Mrs. Hughes was granted conditional U.S. permanent resident status on January 16, 2001, Mr. and Mrs. Hughes moved to California, and Mr. Hughes began working as KPMG's partner in charge of M&A tax services for Northern California. Mr. Hughes received a promotion in 2004 to partner in charge of M&A tax services for the West Area. While in California, Mr. Hughes advised clients on subchapter C issues--in particular, the U.S. tax consequences of M&A-- and managed due diligence engagements. In 2006 KPMG transferred Mr. Hughes to Amsterdam, where he again provided corporate tax advice, this time to Dutch and other European clients, until his January 2007 retirement. Thereafter Mr. and Mrs. Hughes moved first to a temporary home in Portugal and then to a permanent home there, which they occupied in October 2007.

Mr. Hughes' career at KPMG focused almost entirely on the tax aspects of corporate transactions. He had little expertise in individual or estate tax or tax treaty interpretation. He never prepared an individual tax return as a paid return

[*9] preparer, but he did prepare at least two U.S. tax returns, involving the transactions at issue in this case, for himself and his wife.

II.     KCI Stock

During 1999 KPMG spun off its consulting business to a newly formed corporation, KCI. The firm retained a direct equity stake of approximately 20% of KCI's outstanding shares, and these shares were specially allocated among KPMG's partners, including Mr. Hughes (K-1 shares), in January 2000. KPMG caused KCI to issue shares representing the remaining 80% of its equity to KPMG's partners, including Mr. Hughes, who received 95,467 shares of KCI stock (founders' shares) on January 31, 2000. Mr. Hughes did not contribute funds to KPMG in connection with KCI's formation. He took zero bases in the founders' shares.

Mr. Hughes disclosed his interests in the KCI shares on a form completed in connection with his divorce from Brenda Hughes, but he indicated that, because there was no public market for KCI stock and at that time no definitive plan for a public offering, their fair market value could not be ascertained. The divorce had proven highly contentious, and in late 2000, Mr. Hughes began to fear that if the KCI shares were sold in the near future, thereby establishing their putative fair market value, his former wife, Brenda Hughes, would seek to reopen the October

[*10] 2000 court case with respect to the property settlement to argue for a share of the KCI stock sale proceeds. He therefore decided to give some or all of his rights in the KCI shares to his new wife, Vanessa.

Mr. Hughes consulted his divorce lawyer, John Briggs, about how to accomplish the gift under U.K. law. On Mr. Briggs' advice, Mr. Hughes prepared a gift deed, signed it, and had it witnessed. The gift deed apparently provided to the effect that Mr. Hughes "as the legally vested owner, transferred the economic and beneficial ownership" of the KCI shares "to be held in trust absolutely" to Mrs. Hughes.[4] The parties viewed the effectiveness of this attempted transfer as important, if not essential, to the resolution of this case, but because the Court would reach the same resolution regardless of the attempted transfer's effectiveness, we need not resolve the parties' factual disputes on this issue.

---

[4]Mr. Hughes could not produce the original gift deed or any copy thereof. He explained that several boxes of his business and personal items had gone missing during the Hugheses' serial international moves. In 2007 during the audit that led to this case, Mr. Hughes could not find any documents relating to the gift, so he traveled to London to review Mr. Briggs' firm's records from his representation. Mr. Hughes did not locate the principal document he sought, the gift deed, but he did ask Mr. Briggs' partner, David Isaacs, how the gift deed would have been worded. On the basis of Mr. Isaacs' response, Mr. Hughes drafted and signed a declaration containing the quoted phrases, which respondent introduced into evidence at trial. We find that the declaration, as explained and given context by Mr. Hughes' testimony, suffices to establish the wording of the original gift deed.

[*11] Mr. Hughes purported to transfer the KCI shares to Mrs. Hughes in two tranches: an unspecified number of shares having a fair market value of $106,000 in December 2000, and 35,727 shares having a fair market value of $780,992 in January 2001.[5] Petitioners have not identified the specific shares--founders' shares or K-1 shares--included in each gift.

KPMG sold the founders' shares on February 16, 2001. KPMG remitted the net proceeds from the sale, $326,990.29, by check made payable to Mr. Hughes.

KPMG also sold most of the K-1 shares during 2001. On Mr. Hughes' 2001 Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., KPMG reported that his distributive share of KPMG's net long-term capital gain for the year was $857,270. This amount was equal to the net proceeds from the K-1 shares' sale.

III.  Tax Reporting

Mr. Hughes did not advise KPMG of his purported gifts of the KCI shares to Mrs. Hughes either in 2000 or 2001. He did not report the alleged gifts of shares to the U.K. for either 2000 or 2001. Nor did he file a Form 709, United

---

[5]Although petitioners have not identified the specific dates of these alleged gifts, because they contend that Mrs. Hughes was a U.K. resident when the gifts occurred, we presume that the January 2001 gift occurred before petitioners became U.S. residents on January 16 of that year.

[*12] States Gift (and Generation-Skipping Transfer) Tax Return, for the taxable year 2000, during which he claims to have made the first gift of KCI shares to Mrs. Hughes. Mr. Hughes did, however, file a Form 709 for the taxable year 2001 on or about May 12, 2004. Although he professed a lack of familiarity with Form 709, Mr. Hughes prepared that return (gift tax return) himself. The gift tax return reported no gift tax due. Mr. Hughes paid no, gift, inheritance, or capital gains tax to the U.K., and no gift tax to the United States, with respect to the KCI shares for 2000 or 2001.

In addition to the gift tax return, Mr. Hughes also prepared the Hugheses' original, jointly filed 2001 Form 1040, U.S. Individual Income Tax Return (original return). Respondent received the original return on September 24, 2002. On Schedule D, Capital Gains and Losses, of the original return, petitioners reported: (1) $1,105,500 of short-term capital loss attributable to a transaction unrelated to the KCI shares' purported transfer and subsequent sale (unrelated transaction); (2) $326,989 of long-term capital gain attributable to the February 16, 2001, sale of the founders' shares, in which petitioners claimed zero bases; and (3) as passthrough gain from a partnership, S corporation, estate or trust, $857,270 of net long-term capital gain from the K-1 shares' sale.

**[\*13]** During or around 2004, after the Internal Revenue Service (IRS) issued a notice that classified as a listed transaction a transaction substantially similar to the unrelated transaction, Mr. Hughes concluded that he and Mrs. Hughes should amend the original return to reverse almost all of the loss claimed on the unrelated transaction. Hence, Mr. Hughes prepared a 2001 Form 1040X (amended return). Respondent received the amended return on February 4, 2005. On the amended return petitioners reported: (1) $10,500 of short-term capital loss attributable to the unrelated transaction; (2) zero capital gain attributable to the sale of the founders' shares, in which petitioners claimed aggregate bases of $326,989; and (3) $292,275 of long-term capital gain--realized directly rather than as a passthrough item from Schedule K-1--as a result of the sale of the K-1 shares, in which they now claimed aggregate bases of $559,992.

To summarize, petitioners reported bases in the KCI shares and amounts of capital gain from their transactions on Schedules D of the original and amended returns as follows:

| **[*14]** | Original return | | Amended return | |
|---|---|---|---|---|
| | <u>Amount</u> | <u>Where reported</u> | <u>Amount</u> | <u>Where reported</u> |
| Unrelated transaction | ($1,105,500) | Part I, Line 1: Short-Term Capital Gains and Losses | ($10,500) | Part I, Line 1: Short-Term Capital Gains and Losses |
| Bases in founders' shares | -0- | Part II, Line 8: Long-Term Capital Gains and Losses | 326,989 | Part II, Line 8: Long-Term Capital Gains and Losses |
| Gain from sale of founders' shares | 326,989 | Part II, Line 8: Long-Term Capital Gains and Losses | -0- | Part II, Line 8: Long-Term Capital Gains and Losses |
| Bases in K-1 shares | --- | n/a | 559,992 | Part II, Line 8: Long-Term Capital Gains and Losses |
| Gain from sale of K-1 shares | 857,270 | Part II, Line 12: Net Long-Term Gain or (Loss) from Partnerships, S Corporations, Estates and Trusts from Schedules(s) K-1 | 292,275 | Part II, Line 8: Long-Term Capital Gains and Losses |

IV.   <u>Reporting Rationale</u>

Before filing the original return in 2002, Mr. Hughes obtained advice and information from various sources concerning the gifts of KCI shares to Mrs.

[*15] Hughes. First, he consulted his divorce lawyer, Mr. Briggs, about the legal mechanism for making a gift under U.K. law. Mr. Briggs advised him to use a gift deed. Second, over lunch one day, he asked James McLellan, a U.K.-chartered accountant, about the U.K. gift, inheritance, and income tax consequences of a gift of shares. Mr. McLellan advised him that the transaction would not be taxable in the U.K. and that the donee's bases in the shares would be their fair market value. Mr. McLellan, who was not familiar with U.S. law, did not opine on the planned transfer's U.S. tax consequences or the effect of any applicable tax treaty.

Third, Mr. Hughes looked at a brief description of transfers between spouses in the Master Tax Guide and concluded that no recognition of gain or loss was required for U.S. tax purposes. Fourth, Mr. Hughes asked Jeff Sargent, a fellow KPMG partner who specialized in international executive individual income tax returns, to confirm that the transfer of his shares to his nonresident alien wife would be "tax-free for U.S. tax purposes". According to Mr. Hughes, Mr. Sargent confirmed that it would be.

Although he believed that he was obliged to file a gift tax return in connection with the share transfers, Mr. Hughes delayed doing so until 2004 because of his lack of familiarity with Form 709. In preparing the return, Mr. Hughes consulted the Master Tax Guide to ascertain the applicable amount of the

[*16] unified credit against gift and estate tax. He also reread section 1041 of the Code and concluded on the basis of section 1041(d) and his reading of the question and answer portion of the regulations thereunder that the gifts to Mrs. Hughes had been a "taxable transaction" for U.S. tax purposes. Mr. Hughes testified that, while attending a KPMG seminar in Washington, he spoke with two colleagues who worked in the estate and gift tax field who advised him that "the transaction to a nonresident alien spouse was a taxable one".

Mr. Hughes further testified, in sum, that at that point he: (1) believed he had realized capital gain from the gifts to his nonresident alien wife; (2) reviewed, obviously without considering its effective date, a tax treaty between the United States and the U.K. that had been adopted after the dates of the gifts (new treaty); and (3) concluded that, under the new treaty, by virtue of his U.K. residency at the time of the gifts, he was subject to capital gains tax only in the U.K. notwithstanding his U.S. citizenship.

Mr. Hughes reached these conclusions in 2004. When he filed the amended return in 2005, he took the opportunity to modify his reporting of the KCI shares' sale to reflect a stepped-up basis that he believed should have resulted from the taxable gifts. On a statement attached to Form 1040X, he explained his reasoning that section 1041(d) rendered the KCI stock gifts taxable to him but that pursuant

[*17] to the new treaty, he was taxable on capital gain only in the United Kingdom, his country of residence at the time of the gifts.

## V.   Procedural History

Respondent mailed petitioners a notice of deficiency on January 19, 2011. Taking into consideration petitioners' amended return, respondent determined an income tax deficiency of $364,006, a section 6651(a)(1) late-filing addition of $36,400.60, and a section 6662 accuracy-related penalty of $147,286.  Petitioners timely petitioned this Court on June 20, 2011.[6]

Respondent's deficiency determination rested upon multiple adjustments, some of them computational, to petitioners' amended return.  Before trial the parties settled with regard to all but one of the noncomputational adjustments as well as one penalty issue.  Before the filing of stipulations of settled issues concerning these settlements respondent sought, and was granted, leave to file an amendment to answer.  In that amendment to answer respondent asserted a section 6662(a), (b)(3), (e), and (h) gross valuation misstatement penalty solely in relation

---

[6]Because petitioners resided outside the United States when respondent mailed them the notice of deficiency, they had 150 days rather than 90 days within which to timely file their petition.  See sec. 6213(a).  The notice of deficiency incorrectly identified petitioners' last day to timely file a petition as June 17, 2011. In fact, the 150th day fell on Saturday, June 18, 2011, so petitioners' last day to timely file their petition was Monday, June 20, 2011.  See sec. 7503.

**[*18]** to the single noncomputational adjustment that the parties did not resolve before trial--that is, petitioners' claimed bases in the KCI shares at the time of their sale. Petitioners did not file a reply to the amendment to answer. At trial on May 6, 2014, the parties litigated the unresolved noncomputational adjustment as well as the penalties before Judge Kroupa. See supra note 1.

## OPINION

There remain four issues for decision. The first two are: (1) whether Mr. Hughes transferred ownership of the KCI shares to Mrs. Hughes, and (2) if so, whether Mrs. Hughes took bases greater than zero in the KCI shares. For petitioners to prevail, we must answer both questions affirmatively. We conclude that, regardless of how we resolve the first issue, as to the second issue, petitioners had zero bases in the KCI shares when they were sold. Therefore, we will assume, arguendo, that Mr. Hughes gave the KCI shares to Mrs. Hughes and hence proceed directly to the second issue.

Here at the outset, we note that this is an income tax case. Respondent has not determined a deficiency in gift tax, and we do not here consider whether Mr. Hughes' gifts of the KCI shares to Mrs. Hughes were taxable transfers under the gift tax statutes. See, e.g., sec. 2501 (imposing a tax "on the transfer of property by gift * * * by any individual, resident or nonresident"). We thus analyze only

[*19] the income tax consequences of the transfer. Petitioners bear the burden of proof.[7] See Rule 142(a).

## I.     Tax Consequences of Transfer

Assuming, as petitioners claim, that Mr. Hughes made gifts of the KCI shares to Mrs. Hughes, the parties dispute whether these gifts resulted in taxable income to either Mr. or Mrs. Hughes and what bases Mrs. Hughes took in the shares. Respondent maintains that the gifts did not result in taxable income and that Mrs. Hughes took transferred bases from Mr. Hughes under section 1015(a). Petitioners, on the other hand, cite section 1041(d) and United States v. Davis, 370 U.S. 65 (1962), for the twin propositions that (1) the gifts resulted in taxable income as to Mr. Hughes, the donor, and (2) Mrs. Hughes, the donee, took a fair market value basis in the KCI shares.

In Davis, 370 U.S. at 66-67, in a property settlement incident to divorce the taxpayer agreed to transfer certain appreciated property to his soon-to-be-former wife in exchange for her release of her Delaware law marital rights. The principal

---

[7]As a general rule, the Commissioner's determination of a taxpayer's liability in the notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Although sec. 7491 may shift the burden of proof in specified circumstances, petitioners did not argue, and in any event have not established, that they meet the prerequisites under sec. 7491(a)(1) and (2) for such a shift.

**[*20]** question before the Court was whether, in connection with the exchange, the taxpayer should be required to recognize as income the appreciation in the property transferred.  See id. at 68.

Under Delaware law, a wife's "inchoate rights * * * in her husband's property * * * partake more of a personal liability of the husband than a property interest of the wife."  Id. at 70.  Accordingly, the Court adopted the Government's analogy of the exchange to "a taxable transfer of property in exchange for the release of an independent legal obligation."  Id. at 69.  The exchange was thus a taxable event to which the basic principles of sections 1001 and 1012 applied:  The husband's taxable gain was properly measured as the excess of his amount realized--the fair market value of the wife's extinguished marital property rights-- over his adjusted basis in the property transferred, and the wife took a cost basis in the property received.  See id. at 71-73.  To determine the fair market value of the extinguished rights, the Court presumed that the parties had acted at arm's length and reasoned that the value of the rights must be equal in value to the property for which they were exchanged.  Id. at 72.

Because the Court's decision in Davis turned on the nature of the wife's rights under State law, its application resulted in disparate Federal tax treatment

**[\*21]** between States of marital property settlements upon divorce.  See Berger v. Commissioner, T.C. Memo. 1996-76, 71 T.C.M. (CCH) 2160, 2177 (1996).

> [U]pon an approximately equal division of community property on divorce, no gain was recognized on the theory that there was only a nontaxable partition, not a sale or exchange.  Carrieres v. Commissioner, 64 T.C. 959, 964 (1975), affd. per curiam, 552 F.2d 1350 (9th Cir. 1977); see also Siewert v. Commissioner, 72 T.C. 326, 332-333 (1979).  The Commissioner applied a like result to the partition of jointly held property.  See Rev. Rul. 74-347, 1974-2 C.B. 26.  The tax treatment of divisions of property between spouses involving other various types of ownership under the different State laws was often unclear and resulted in much litigation.  See H. Rept. 98-432 (Part 2), at 1491 (1984).  Several common law States had tried to avoid the result in the Davis case by amending and bending their property and equitable distribution laws.  Id.
>
> Congress was dissatisfied with the resulting patchwork and desired to make the Federal tax law less intrusive into marital property relationships.  Id. at 1492.  Section 1041 was the result.
> [Id.]

Today, section 1041(a) provides that "[n]o gain or loss shall be recognized on a transfer of property from an individual to" a spouse, or to a former spouse incident to divorce.  To complement this nonrecognition rule, the statute provides for the recipient spouse (or former spouse) to take a transferred basis in the property.  Sec. 1041(b)(2).

When the recipient spouse is a nonresident alien, however, section 1041(a) does not apply.  See sec. 1041(d).  In this circumstance, petitioners urge, Davis

[*22] still governs. As they read <u>Davis</u>, the KCI share transfer is taxable to the transferor spouse and the recipient spouse takes a fair market value basis in the property received.

Petitioners' logic suffers from at least three fatal flaws. First, they fail to appreciate the distinction between realization of income and its recognition. Second, <u>Davis</u> is inapposite because it involved an exchange, not a gift. Third, even if <u>Davis</u> applied here, it would not produce the result petitioners seek.

A.     <u>Recognition vs. Realization</u>

First, petitioners fail to appreciate that section 1041(a) is a <u>nonrecognition</u> provision: It applies where gain or loss has been realized and would otherwise be recognized under the Code. <u>See</u> <u>Blatt v. Commissioner</u>, 102 T.C. 77, 79 (1994) (characterizing section 1041 as a nonrecognition provision). Section 1041(d) simply restores the status quo when the recipient spouse is a nonresident alien, such that ordinary recognition rules apply to the transferor and transferee. If the transferor spouse has realized gain or loss, and no other Code section provides for nonrecognition, then that gain or loss must be recognized.[8] <u>See</u> sec. 1.1041-1T(a),

_____

[8]To support their argument that sec. 1041(d) mandates recognition, petitioners assert that Congress enacted sec. 1041(d) "to ensure that [property] * * * transferred * * * from a resident to a non-resident alien would not forever escape taxation by the United States". As authority for this proposition, they cite

(continued...)

[*23] A-3, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984)

("Gain or loss (if any) is recognized (assuming no other nonrecognition provision

applies) at the time of a transfer of property if the property is transferred to a

spouse who is a nonresident alien." (Emphasis added.)).

Where, as here, an interspousal property transfer takes the form of a gift, no

gain is realized, so regardless of whether section 1041(a) applies, there is no gain

to be recognized.  The Code imposes income tax on individuals' taxable income,

which consists of gross income less allowable deductions.  Secs. 1, 63(a).  Gross

income, in turn, means "all income from whatever source derived", sec. 61(a), and

income encompasses "undeniable accessions to wealth", Commissioner v.

Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  As a general matter, a donor does

---

[8](...continued)
legislation limiting the estate tax marital deduction for transfers to nonresident alien spouses, the expatriation tax of sec. 877, and the requirement of sec. 6851(d) that an alien departing the United States obtain a certificate of compliance with income tax obligations from the IRS.  These authorities may illustrate that Congress generally desires to limit erosion of the U.S. income tax base through the transfer of untaxed gains beyond its jurisdiction, but they demonstrate nothing concerning Congress' intent in enacting sec. 1041(d).  The definition of income and the realization requirement are bedrock principles of U.S. income tax law. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955) (interpreting "income" within the predecessor statute of sec. 61 as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion"). We will not, on the basis of unrelated legislation enacted at different times by different Congresses, read into sec. 1041(d) an intent to impose income tax in the absence of income realization.

[*24] not realize income from making a gift.  See Rauenhorst v. Commissioner, 119 T.C. 157, 162-163 (2002) ("'A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale.'" (emphasis added) (quoting Humacid Co. v. Commissioner, 42 T.C. 894, 913 (1964))).  Rather, a gift, by its nature, reduces the donor's wealth and represents an economic loss to the donor.

The donee, on the other hand, realizes an economic gain upon receipt of a gift.  His or her wealth increases by the value of the gift.  But for tax purposes section 102(a) excludes this gain from the donee's gross income.  To preserve the U.S.' ability to tax any unrecognized gain in property that is the subject of the gift, section 1015(a) sets the donee's basis in the property equal to the lesser of the donor's basis (or that of "the last preceding owner by whom it was not acquired by gift") or if there is unrecognized loss, then for loss purposes, the property's fair market value.  Cf. sec. 1015(e) (providing that for interspousal gifts that are subject to section 1041(a), section 1041(b)(2) determines the transferee's basis).

In sum, under these general rules, no income tax is imposed on either donor or donee because neither party realizes income from the gift.  Hence, when Mr. Hughes gave the KCI shares to Mrs. Hughes, neither spouse realized income, and

[*25] thus neither spouse could recognize income. The gifts were not income taxable events, and nothing in the Code or the regulations thereunder provided for Mrs. Hughes to take stepped-up bases in the shares. Rather, she took transferred bases of zero from her husband, the donor.[9]

B. Gifts vs. Exchanges

Davis, on which petitioners primarily rely, does not suspend or modify the essential principles discussed above. Moreover, the facts of Davis differ materially from those at issue here: Mr. Hughes gave the KCI shares to his wife, whereas Davis involved an exchange incident to divorce.

---

[9]The parties have stipulated that Mr. Hughes had zero bases in the founders' shares. They did not stipulate his bases in the K-1 shares.

Petitioners introduced no evidence concerning Mr. Hughes' alleged bases in the K-1 shares. Petitioners did claim an aggregate basis of $559,992 in these shares on the amended return. But an income tax return "is merely a statement of" a taxpayer's claim and "is not presumed to be correct." Roberts v. Commissioner, 62 T.C. 834, 837 (1974). Petitioners provided no explanation of how they computed their claimed basis and no evidentiary support for it. In his testimony, Mr. Hughes merely described this number as reflecting the "step-up in basis" that he believed Mrs. Hughes "was due" under the Code. Even if we assume that he considered this amount to be the K-1 shares' fair market value at the time of the gifts, he provided no information about how he determined it. This amount is considerably less than the price at which KPMG sold the K-1 shares during the course of 2001. In contrast, for the founders' shares, which Mr. Hughes gave to Mrs. Hughes along with the K-1 shares, he claimed on the amended return an aggregate basis equal to the price at which the shares were sold. Mr. Hughes provided no rationale for this disparate treatment of the two blocks of KCI shares. Petitioners have not carried their burden of proving that Mr. Hughes, and thus Mrs. Hughes, had bases greater than zero in the K-1 shares.

**[*26]** Mr. and Mrs. Davis entered into a "voluntary property settlement and separation agreement" under which Mr. Davis agreed to transfer to Mrs. Davis 1,000 shares of stock "'in full settlement and satisfaction of any and all claims and rights against * * * [him] whatsoever (including but not by way of limitation, dower and all rights under the laws of testacy and intestacy)'". Davis, 370 U.S. at 66-67. The divorce decree incorporated this agreement. Id. at 67. After Mr. Davis delivered one-half of the stock pursuant to the agreement, the IRS determined that he should have recognized gain on the transfer. See id. at 66-67.

When the dispute over this determination reached the Supreme Court, the Court framed the question before it as "whether the transfer in issue was an appropriate occasion for taxing the accretion to the stock." Id. at 68. Was it a "'sale or other disposition'" within the meaning of section 1001, from which Mr. Davis should recognize taxable gain? Id. at 68-69. Mr. Davis compared the transaction "to a nontaxable division of property between two co-owners", whereas the IRS likened it to "a taxable transfer of property in exchange for the release of an independent legal obligation." Id. at 69. The Court sided with the IRS, concluding that Mr. Davis had exchanged the stock for release from financial obligations to his former wife created by Delaware law. Id. at 70. Hence, the transaction was taxable. See id. at 71.

**[*27]** The stock transfer in <u>Davis</u> occurred pursuant to a written, mutual settlement agreement under which the parties acted at arm's length. <u>See</u> <u>id.</u> at 66, 72. In contrast, Mr. Hughes unilaterally prepared and executed a gift deed to effect the transfer at issue. More important, the transfer in <u>Davis</u> was not a gift but an exchange. <u>See</u> <u>id.</u> at 69 n.6. Petitioners have never contended that Mr. Hughes received anything from Mrs. Hughes in exchange for the KCI shares. Even if petitioners had raised this argument, the record contains no evidence that Mrs. Hughes transferred property or rights of any kind to her husband in exchange for the KCI shares. Rather, petitioners have consistently maintained that Mr. Hughes gave the KCI shares to Mrs. Hughes. The Court in <u>Davis</u> specifically emphasized that the transaction at issue was not a gift: "Property transferred pursuant to a negotiated settlement in return for the release of admittedly valuable rights is not a gift in any sense of the term." <u>Id.</u> at 69 & n.6.

These factual distinctions render <u>Davis</u> wholly inapposite. The factual predicate to taxation in <u>Davis</u> was that Mr. Davis had <u>received</u> something of value; he realized a gain within the meaning of section 61. <u>See</u> <u>Davis</u>, 370 U.S. at 68-70. That factual predicate is absent here.

**[\*28]** C.     Fair Market Value vs. Cost

Even if we were to apply <u>Davis</u>, doing so would not produce the result petitioners seek:  fair market value bases for Mrs. Hughes in the KCI shares.  After determining that the transaction was taxable to Mr. Davis, the Court in <u>Davis</u> turned to Mrs. Davis' basis in the stock she received.  On that question "all indicia point[ed] to a 'cost' basis for this property in the hands of the wife."  <u>Id.</u> at 73.  To determine Mrs. Davis' cost, the Court looked to the value of the rights she had relinquished.  <u>See id.</u>  Because the Court assumed that the parties had acted at arm's length, it concluded that they must have exchanged property of equal value.  <u>Id.</u> at 72.  Hence, Mr. Davis had received, and Mrs. Davis had given up, property having a fair market value equal to that of the transferred stock.  <u>See id.</u> at 72-73.

If we were to treat Mr. Hughes' gifts of KCI shares to Mrs. Hughes as taxable transactions under <u>Davis</u>, Mr. Hughes' amount realized and Mrs. Hughes' aggregate costs basis in the KCI shares would be the fair market value of what she transferred to Mr. Hughes in exchange for the KCI shares.  There was no exchange, so that fair market value would be zero.

Contrary to petitioners' reading, <u>Davis</u> does not establish a blanket rule that the recipient of a taxable interspousal transfer takes a fair market value basis in the property received.  The Court in <u>Davis</u> treated Mrs. Davis' relinquished marital

**[\*29]** rights as having equal value to the shares she received because the rights were inchoate and thus difficult to value and because "[a]bsent a readily ascertainable value it is accepted practice where property is exchanged to hold * * * that the values 'of the two properties exchanged in an arms-length transaction are either equal in fact or are presumed to be equal.'" Id. at 72 (citation omitted) (quoting Phila. Park Amusement Co. v. United States, 126 F. Supp. 184, 189 (Ct. Cl. 1954)).  Valuing what Mrs. Hughes transferred to her husband for the KCI shares presents no such difficulty:  She transferred nothing, so the value transferred was zero.

D.    Conclusion

Even had Mr. Hughes made completed gifts of an undivided legal and beneficial interest in the founders' shares and the K-1 shares to Mrs. Hughes, Mrs. Hughes would have zero bases in those shares.  See sec. 1015(a).  Under the Code, the gifts were not taxable events for income tax purposes.  See secs. 61, 102(a).  As explained above, Davis does not support a contrary conclusion.  Regardless of which of the Hugheses owned the KCI shares when they were sold, that person had zero bases in the shares.  Accordingly, we will sustain respondent's determination of a deficiency with respect to petitioners' gain on the KCI shares' disposition as reported on their amended return.

**[\*30]** II.     Applicability of Penalties

In the notice of deficiency, respondent determined that petitioners were liable for a section 6662(a) and (b)(1), (2), and (3) accuracy-related penalty with respect to their underpayment of income tax for the 2001 taxable year on the basis of a substantial valuation misstatement, negligence or disregard of rules and regulations, and/or a substantial understatement of income tax.  In an amendment to answer, respondent further asserted a section 6662(a), (b)(3), (e), and (h) gross valuation misstatement penalty with respect to the portion of petitioners' underpayment of income tax for the 2001 taxable year that was attributable to their overstatement of bases in the KCI shares on the amended return.  Hence, respondent determined that either a 40% or a 20% penalty would apply to any underpayment.  See sec. 6662(a), (b)(1)-(3), (c)-(e), (h); see also sec. 1.6662-2(c), Income Tax Regs. (explaining that where more than one penalty could apply to a portion of an underpayment, penalties do not stack, and only the maximum potentially applicable penalty applies).

As a general rule, the Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also sec. 7491(c).  For all but one of the penalties at issue here, once

**[\*31]** respondent has met this burden of production, the burden will shift to petitioners to prove an affirmative defense or that they are otherwise not liable for the penalty. See Higbee v. Commissioner, 116 T.C. at 446-447. With respect to the remaining penalty--the gross valuation misstatement penalty with respect to petitioners' claimed bases in the KCI shares, which respondent first asserted in his amendment to answer--respondent bears the burden of proof. See Rule 142(a)(1) (the Commissioner bears the burden of proof with respect to a "new matter"); Seventeen Seventy Sherman St., LLC v. Commissioner, T.C. Memo. 2014-124, at \*35-\*36 (the Commissioner bears the burden of proof with respect to a penalty first raised in his amendment to answer).[10]

---

[10]Where the Commissioner first asserts an addition to tax under sec. 6651(a) in an answer or amendment thereto, we have described his burden of proof as requiring him to establish the absence of "exculpatory factors." See Rader v. Commissioner, 143 T.C. ___, ___ (slip op. at 22) (Oct. 29, 2014); see also Arnold v. Commissioner, T.C. Memo. 2003-259, 86 T.C.M. (CCH) 341, 344 (2003). In at least one instance, we have observed that this rule might be extended to the penalty context, such that where the Commissioner first asserts a sec. 6662 penalty in an answer or amendment to answer, his burden of proof entails establishing the absence of a sec. 6664(c) reasonable cause defense. See Cavallaro v. Commissioner, T.C. Memo. 2014-189, at \*50-\*51. There, however, we were able to resolve the issue of whether sec. 6664(c) applied without having to resolve the burden of proof issue. See id. at \*51 (citing Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998) ("[W]e decide the issue on a preponderance of the evidence; therefore, the allocation of the burden of proof does not determine the outcome[.]")). Similarly, here we would reach the same conclusion with respect to the reasonable cause and good-faith defense no matter

(continued...)

**[\*32]**  A.  Valuation Misstatement Penalty

Section 6662(a) and (b)(3) provides for the imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement.  For returns filed on or before August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)".  Sec. 6662(e)(1)(A).  Section 6662(h) increases this penalty to 40% if the value or adjusted basis claimed on the return is 400% or more of the actual value or adjusted basis.  A regulation clarifies that, when the actual value or basis is zero, any claimed value is considered 400% or more of the correct amount.  Sec. 1.6662-5(g), Income Tax Regs.

In the notice of deficiency, respondent determined that petitioners had zero bases in the founders' shares and the K-1 shares.  We have sustained those determinations in their entirety.  Consequently, for both blocks of KCI shares,

---

[10](...continued)
how the burden of proof is allocated.  We therefore leave this issue for another day.

**[\*33]** petitioners' aggregate basis as reported on their amended return exceeded

the correct value by 400% or more and was a gross valuation misstatement.

A section 6662 penalty generally will not apply to any portion of an

underpayment resulting from positions taken on the taxpayer's return for which

the taxpayer had reasonable cause and with respect to which the taxpayer acted in

good faith.  See sec. 6664(c).  Petitioners claim that they relied reasonably and in

good faith on Mr. McLellan and Mr. Hughes' colleagues at KPMG and that they

otherwise had reasonable cause for the tax bases in the KCI shares claimed on the

amended return.[11]

---

[11]Petitioners did not raise this affirmative defense or plead any of the relevant facts in their petition, and they did not file a reply to respondent's amendment to answer, in which respondent first asserted the gross valuation misstatement penalty with respect to the KCI shares' reported bases.  Ordinarily, an affirmative defense not pleaded "is deemed to be waived."  Gustafson v. Commissioner, 97 T.C. 85, 90 (1991).  Because respondent has not objected, however, and because both parties address the defense in their briefs, we will treat it as an issue tried by implied consent of the parties under Rule 41(b)(1).

In their posttrial briefs petitioners also raised the substantial authority, reasonable basis, and adequate disclosure defenses.  These defenses are not defenses to the gross valuation misstatement penalty.  See sec. 6662(d)(2)(B) (providing for reduction of the amount of the "understatement" computed under sec. 6662(d)(2)(A) for purposes of determining the existence of a substantial understatement of tax, by the portion of the understatement attributable to any tax position for which the taxpayer had substantial authority, or if the relevant facts were adequately disclosed on or in an attachment to the taxpayer's return, for which the taxpayer had a reasonable basis); see also, e.g., New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 189 (2009) (where a taxpayer asserted a

(continued...)

**[\*34]** We determine "whether a taxpayer acted with reasonable cause and in good faith * * * on a case-by-case basis, taking into account all pertinent facts and circumstances", sec. 1.6664-4(b)(1), Income Tax Regs., including "[t]he taxpayer's mental and physical condition, as well as sophistication with respect to the tax laws, at the time the return was filed", Kees v. Commissioner, T.C. Memo. 1999-41, 77 T.C.M. (CCH) 1374, 1378 (1999); accord Ruckman v. Commissioner, T.C. Memo. 1998-83, 75 T.C.M. (CCH) 1880, 1886 (1998); Escrow Connection, Inc. v. Commissioner, T.C. Memo. 1997-17, 73 T.C.M. (CCH) 1705, 1714 (1997). Reliance on professional advice will absolve the taxpayer if "such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. Otherwise, a taxpayer may show that he took the tax position at issue because of an honest, reasonable misunderstanding of fact or law. Id.

### 1. Reliance on Professional Advice

Where a taxpayer claims reliance on professional advice, section 6664(c) will apply if "the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to

---

[11](...continued)
substantial authority defense, holding the taxpayer liable for the gross valuation misstatement penalty but analyzing the defense only in connection with the substantial understatement penalty), aff'd, 408 Fed. Appx. 908 (6th Cir. 2010).

**[\*35]** justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  The record establishes that petitioners did not satisfy this test with respect to any of their advisers.

With respect to Mr. McLellan, Mr. Hughes acknowledged that Mr. McLellan was not familiar with U.S. tax law and did not opine on the U.S.-U.K. tax treaty.  Mr. McLellan thus plainly lacked sufficient expertise to justify reliance with respect to a position taken on a U.S. tax return as to the application of U.S. law.  Second, Mr. Hughes testified that, while he did not formally engage Mr. McLellan, during a lunch meeting he provided "all the relevant details and facts that were needed for Mr. McLellan to reach a conclusion on the basis of the application of U.K. tax law".  Petitioners have not established what information was provided, and it is not clear that the information necessary to a U.S. tax law analysis, in these circumstances, was coextensive with that necessary to a U.K. tax law analysis.  The evidence indicates that Mr. Hughes did not provide the "necessary and accurate information" required by <u>Neonatology</u>'s second prong.

Third, although Mr. Hughes testified that Mr. McLellan told him that Mrs. Hughes would take fair market value bases in the gift shares under U.K. law, Mr.

[*36] Hughes also testified that Mr. McLellan provided no advice as to the gifts' U.S. tax consequences. Hence, Mr. Hughes could not have actually relied in good faith upon Mr. McLellan's advice in taking the tax position at issue--that is, the position that, under U.S. income tax law, Mrs. Hughes took fair market value bases in the KCI shares. Consequently, with respect to Mr. McLellan, petitioners fail all three prongs of the Neonatology test.

With respect to Mr. Hughes' colleagues at KPMG, he testified that Jeff Sargent, an international executive tax partner who had specialized in individual income tax returns for U.S. citizens resident in the U.K. and Europe for 25 to 30 years, had advised him that the gifts of KCI shares to Mrs. Hughes "would be tax-free for U.S. tax purposes." Even if we accept Mr. Hughes' brief testimony concerning Mr. Sargent's qualifications as evidence of sufficient expertise to justify reliance, petitioners still face two obstacles. First, Mr. Hughes offered no testimony as to what information he provided to Mr. Sargent. Indeed, his testimony reflects that he merely asked Mr. Sargent, informally, to "confirm" his own prior conclusion about the gifts' U.S. tax consequences. Second, Mr. Hughes could not have actually relied on Mr. Sargent's alleged advice in taking the tax position at issue--namely, that gifts of the KCI shares were income-taxable transactions, such that Mrs. Hughes would receive stepped-up bases. This

**[*37]** position is directly contrary to Mr. Sargent's advice that the gifts "would be tax-free for U.S. tax purposes." Accordingly, petitioners have not satisfied the Neonatology test with respect to Mr. Sargent.

Finally, Mr. Hughes testified that, while attending a KPMG seminar in Washington during or around 2004, he spoke with "a couple of partners who did work in the estate and gift area" who advised him that the gifts were taxable. Mr. Hughes did not provide any further information about these unnamed individuals' qualifications or expertise. He did not describe what information, if any, he provided to them to elicit their opinions. Moreover, Mr. Hughes did not testify that these individuals advised him what bases Mrs. Hughes would take in the shares, which is the ultimate tax position at issue. Petitioners thus offered no evidence to satisfy any of Neonatology's three prongs with respect to the unnamed advisers.

In sum, the record establishes that petitioners do not qualify for the reasonable reliance affirmative defense.

### 2. Misunderstanding of Fact or Law

In addition to reasonable reliance on professional advice, a second, alternative "[c]ircumstance[] that may indicate reasonable cause and good faith" is "an honest misunderstanding of fact or law that is reasonable in light of all of the

[*38] facts and circumstances, including the experience, knowledge, and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs.

According to his testimony, Mr. Hughes' rationale for the tax position at issue--that his gifts of KCI shares to Mrs. Hughes were taxable to him at the times of the gifts and that she took fair market values bases in the shares--was as follows: (1) after initially believing, in 2001, that the gifts had been nontaxable and that petitioners had zero bases in the KCI shares when they were sold, upon reconsidering these transactions in 2004 he interpreted section 1041(d) and the regulations thereunder as providing that any transfer of property, including by gift, to a nonresident alien spouse was taxable to the donor spouse for income tax purposes; and (2) in mistakenly reviewing the new treaty rather than the one in effect when the gifts were made, he concluded that--although he was a U.S. citizen--under the treaty, he was not subject to U.S. capital gains tax on the transfer by virtue of his then U.K. residency. As we have explained, the gifts did not generate income to Mr. Hughes, so it was irrelevant whether, under the applicable tax treaty, the United States could tax a U.S. citizen resident in the United Kingdom on capital gain. Mr. Hughes plainly misunderstood the law applicable to the gifts.

[*39] Considering Mr. Hughes' experience, knowledge, and education, this misunderstanding was not reasonable. As of 2005, when petitioners took the tax position at issue in their amended return, Mr. Hughes had worked for more than 25 years as a tax professional at KPMG, where he advised clients on the U.S. tax consequences of cross-border transactions. For almost 20 of those years, he had been a KPMG partner. Although he had no expertise in individual tax matters or tax treaty interpretation, he did have sufficient experience to know that--as with any authority he might consult when advising a client on a tax issue--he needed to check the new treaty's effective date before relying upon it.

Mr. Hughes' extensive experience also renders his misinterpretation of section 1041 difficult to account for. As explained above, section 1041(a) provides for nonrecognition on interspousal transfers, and section 1041(d) provides that section 1041(a) does not apply where the transferee spouse is a nonresident alien. When a nonrecognition provision does not apply to a transaction, recognition is not automatically required. Other nonrecognition provisions may apply, or the transaction may be one in which no income is realized, as is true with regard to the donor when the transaction is a gift. The foregoing principles represent fundamental premises of income taxation. Mr. Hughes should reasonably have learned or at least been aware of them in studying

**[\*40]** for his C.P.A. licensing exam, and if he did not, these fundamentals should not reasonably have eluded him throughout his KPMG career.

Finally, even if Mr. Hughes' misreading of section 1041(a) had been reasonable, his misreading of the treaty was not. Although Mr. Hughes primarily advised corporate clients, the rule that U.S. citizens are subject to Federal income taxation on their worldwide income is fundamental to U.S. tax law. See, e.g., Cook v. Tait, 265 U.S. 47, 56 (1924); Huff v. Commissioner, 135 T.C. 222, 230 (2010). For this reason, as Mr. Hughes must as a U.S. international tax expert have been well aware, U.S. income tax treaties regularly include a saving clause that allows the U.S. to tax its citizens' income as if the treaty were not in effect. See, e.g., Duncan v. Commissioner, 86 T.C. 971, 974-975 (1986).

On the amended income tax return, Mr. Hughes asserted that the new treaty did not include such a clause. But the new treaty does include a saving clause in Article 1, General Scope, paragraph 4, subject to the exceptions in paragraph 5. See Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and on Capital Gains, U.S.-U.K., art. I para. 4, July 24, 2001, T.I.A.S. No. 13,161.

**[*41]** Given his extensive knowledge of and experience with U.S. tax law, Mr. Hughes should have realized that the conclusion he reached--that the KCI shares' bases would be stepped up to fair market value, such that the built-in gain in those shares would never be subject to tax in either the United States or the United Kingdom--was too good to be true. Petitioners have not shown that Mr. Hughes' misreading of section 1041 and the tax treaty was "reasonable in light of all of the facts and circumstances". See sec. 1.6664-4(b)(1), Income Tax Regs.

### 3. Conclusion

For the foregoing reasons, we will sustain respondent's determination of a 40% gross valuation misstatement penalty with respect to petitioners' overstatement of their bases in the KCI shares on their amended 2001 return. Because we find the 40% gross valuation misstatement penalty applicable to any underpayment resulting from respondent's determinations with respect to petitioners' bases in the KCI shares, we need not address whether the substantial understatement and negligence penalties would also apply to this portion of petitioners' underpayment. See sec. 1.6662-2(c), Income Tax Regs.

### B. Other Accuracy-Related Penalties

Section 6662(a) and (b)(1) and (2) provides for the imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return

**[\*42]** that is attributable to negligence, disregard of rules and regulations, or a substantial understatement of income tax. Negligence "includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c). It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). Disregard of rules and regulations "includes any careless, reckless or intentional disregard of rules or regulations", including the Code, the regulations thereunder, and guidance published by IRS. Sec. 1.6662-3(b)(2), Income Tax Regs. A substantial understatement of income tax, as to an individual, is an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Respondent determined penalties on each of these two grounds in the notice of deficiency and, on brief, contends these penalties apply with regard to the settled issues.

Respondent's argument concerning negligence and disregard of rules or regulations is easily answered. Section 7491(c) places the burden of producing evidence to support a penalty determination on respondent. Respondent did

**[\*43]** produce, and the record does include, some evidence to support a penalty determination as to one of the settled issues, the unrelated transaction. The parties agreed upon the penalty applicable to that settled issue before trial. At no point, however, did respondent produce evidence relevant to the other settled issues, and the record does not otherwise contain any such evidence. Absent any evidence that petitioners were negligent or disregarded rules and regulations with regard to these other settled issues, we cannot sustain respondent's penalty determination on the grounds of negligence or disregard of rules and regulations.

Whether a substantial understatement exists, and if so, in what amount, will depend upon the recalculation of petitioners' tax liability on the basis of the stipulations of settled issues, the parties' other concessions, and the holdings reached in this opinion. We leave these calculations to the parties under Rule 155. To the extent a substantial understatement within the meaning of section 6662(d)(1)(A) exists with respect to the tax stated on the amended return, petitioners will be liable for the 20% penalty under section 6662(a) and (b)(2) with respect to the portion of the underpayment attributable to settled issues other than the unrelated transaction, unless they can establish an affirmative defense.

Petitioners point to three: (1) reasonable cause and good faith, (2) substantial authority, and (3) reasonable basis and adequate disclosure. We have

[*44] outlined the law applicable to the reasonable cause and good-faith defense above. See supra pp. 33-35, 37-38. Under section 6662(d)(2)(B), the amount of an understatement of income tax is reduced for any item that is supported by substantial authority or, if the taxpayer adequately disclosed relevant facts on the return or an attachment statement, by a reasonable basis. The substantial authority standard is an objective one and involves an analysis of the law and its application to relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. "The substantial authority standard is less stringent than the more likely than not standard * * * but more stringent than the reasonable basis standard". Id. The reasonable basis standard, in turn, is "significantly higher than not frivolous or not patently improper * * * [and] is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Sec. 1.6662-3(b)(3), Income Tax Regs.

In raising these three defenses to the substantial understatement penalty, petitioners face the same problem that respondent faced in arguing for the negligence and disregard of rules and regulations penalties: The record contains no evidence tending to suggest that petitioners reasonably relied upon professional advice, reasonably misunderstood fact or law, or had substantial authority or even a reasonable basis for the positions they took on their amended return with regard to the settled issues. Petitioners presented some evidence to support their

**[\*45]** arguments that Mr. Hughes reasonably relied upon professional advice with regard to Mrs. Hughes' bases in the KCI shares, that he had substantial authority for the bases claimed on the amended return, and that he had a reasonable basis for that position and adequately disclosed it in the statement attached to the amended return. With regard to the settled issues, however, presumably because they were settled, the parties did not address them during trial, in their stipulation of facts, or in their joint or respective exhibits.

For the foregoing reasons, to the extent the parties' Rule 155 computation reflects that a substantial understatement exists with respect to the tax stated on petitioners' amended return, petitioners will be liable for the substantial understatement penalty for 2001 with respect to the portion of their underpayment attributable to the settled issues (other than the unrelated transaction).

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered under

Rule 155.